******************************************************
The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* JERMAINE E.
REDDICK
(AC 38446)

Sheldon, Keller and Prescott, Js.

*Syllabus*

The defendant, who had been convicted of several offenses that arose from
a shooting incident, appealed to this court, claiming that he was deprived
of his constitutional right to a fair trial as a result of certain allegedly
improper comments that the prosecutor made during closing argument
to the jury. The defendant asserted, inter alia, that the prosecutor improp-
erly used the defendant's exercise of his right to remain silent as evidence
of his guilt, expressed his opinion about a witness' credibility and
appealed to the jurors' emotions. The defendant and his girlfriend, G,
had argued on their way to G's home after leaving a party that they had
attended. When they arrived, G called her mother to ask that she come
and pick up G's minor child. G's mother then woke up her brother, the
victim, and G's mother and the victim thereafter drove to G's house,
where they observed the defendant in the passenger seat of a vehicle
that was leaving the premises. The victim approached the vehicle in
which the defendant was sitting, and the defendant eventually got out
of the vehicle and shot the victim with a handgun. The defendant then
got back into the vehicle, which left the premises. A police officer
thereafter stopped the defendant's vehicle and arrested him. During a
police search of the vehicle, a handgun was found, which the defendant
stated belonged to him. During the encounter with the officer, the defen-
dant did not inform him that he shot the victim in self-defense. At trial,
the defendant, who previously had been convicted of a felony, claimed
that he had shot the victim in self-defense. G, who sustained injuries
on the evening of the shooting, gave conflicting accounts through testi-
mony and statements given to the police as to how she sustained those
injuries. Although both parties questioned the arresting officer as to the
sequence of events pertaining to his stop of the defendant's vehicle,
neither the state nor the defendant established when in that sequence
the defendant was arrested or if and when the officer informed the
defendant his constitutional rights. *Held*:

1. The defendant could not prevail on his claim that his constitutional right
   to a fair trial was violated when the prosecutor stated during closing
   argument to the jury that the defendant did not inform the police officer
   who arrested him that he acted in self-defense when he shot the victim,
   thereby using his postarrest silence as circumstantial evidence of his
   guilt: there was no basis on which to conclude that the prosecutor used
   the defendant's exercise of his right to remain silent as evidence of his
   guilt, as the record did not establish when the defendant was arrested,
   whether the arrest preceded or followed the questioning of him by the
   police officer who stopped the defendant's vehicle, and if and when the
   officer informed the defendant of his constitutional rights, and there
   was no evidence that the defendant expressly invoked his right to remain
   silent during his encounter with the officer.

2. This court found unavailing the defendant's claim that he was deprived
   of his due process rights to a fair trial when the prosecutor allegedly
   expressed his opinion during closing argument as to the credibility of
   G, and appealed to the jurors' emotions by referencing a trend in gun
   violence and referring to the defendant as a convicted felon and a
   predator: contrary to the defendant's claim that the prosecutor
   expressed his belief that G lied about her injuries, the prosecutor argued
   that G was biased in favor of the defendant and had a motive to testify
   favorably for him, and asked the jury to draw reasonable inferences
   from G's testimony, in which she presented different accounts as to how
   she was injured on the evening of the shooting; furthermore, although the
   prosecutor's reference to broader issues of gun violence and certain
   comments he made about the defendant's prior felony conviction were
   improper, the court's jury instructions were sufficient to cure any preju-
   dice resulting from the gun violence comment, the prosecutor did not

refer to the defendant as a predator, and the defendant failed to demonstrate that, in the context of the entire trial, the challenged comments that were deemed improper were so egregious as to render the trial unfair, as the state's case was strong, the comments were infrequent and the defendant failed to object to the comments at issue.

Argued February 3—officially released July 11, 2017

(Appeal from Superior Court, judicial district of New Haven, B. Fischer, J.)

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the first degree, criminal possession of a firearm and assault in the third degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *B. Fischer, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Robert E. Byron*, assigned counsel, for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, *Michael Dearington*, former state's attorney, and *Gary W. Nicholson*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Jermaine E. Reddick, appeals from the judgment of conviction, rendered against him after a jury trial in the judicial district of New Haven, on charges of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), and assault in the third degree in violation of General Statutes § 53a-61 (a) (1). On appeal, the defendant claims that his conviction should be reversed on grounds that the prosecutor, in his closing argument to the jury, violated his right to a fair trial by (1) improperly commenting on the defendant's failure to inform police officers at the time of his arrest that he had shot the victim in self-defense; (2) offering his personal opinion as to the credibility of a state's witness; and (3) appealing to the emotions of the jurors by injecting extraneous issues into the trial and commenting on the defendant's prior felony conviction. We affirm the judgment of the trial court.

The jury was presented with the following evidence upon which to base its verdict. In the early morning hours of April 29, 2013, the defendant, along with his girlfriend, Myesha Gainey, and their three year old daughter, J,[1] got a ride home from a party they had attended earlier in the evening. Both the defendant and Gainey had been drinking before the ride. At the start of the ride, the defendant was seated in the front passenger seat, while Gainey sat in the backseat with J. At some point during the ride, however, the defendant reached into the backseat, unbuckled J's seat belt, and lifted her into the front seat, where she remained unbuckled for the remainder of the ride. Upon seeing that J was unbuckled in the front seat of the car, Gainey began to argue with the defendant. The argument continued until the couple reached Gainey's home at 38 Peck Street, New Haven, where the defendant stayed several nights a week.

Upon arriving at 38 Peck Street, Gainey took J up to the second floor of the home. There, she told the defendant that she was going to call her mother, Marjorie Tillery, to come over and pick up J.[2] The defendant and Gainey then started to argue again. Shortly before 1 a.m., Marjorie Tillery received a phone call from J, who was crying and sounded distraught. During this phone call, Tillery also spoke with Gainey, who sounded emotional and upset. Although Gainey provided few details to her mother about what was happening, Tillery became concerned for Gainey's and J's safety, and agreed to drive over to Peck Street from her home in West Haven.

Thereafter, Tillery woke up the victim, her brother, Mickey Tillery, who was asleep in another room. She told her brother that the defendant had been hitting

Gainey, and thus that she wanted him to accompany her to retrieve Gainey and J from New Haven.[3] The Tillerys then drove together from West Haven to Lombard Street, New Haven, where Gainey had instructed Marjorie Tillery to meet her.[4] After waiting several minutes at that location, the Tillerys left Lombard Street and drove over to Peck Street.[5] When they arrived, however, they were unable to find parking in the lot behind Gainey's home, and Marjorie Tillery parked her Chevy Tahoe truck in the middle of the parking lot, blocking several occupied parking spaces. At that time, Marjorie Tillery attempted to call Gainey to inform her that they had arrived at Peck Street. Within minutes of the Tillerys' arrival, a grey station wagon began to back out of a parking spot that was partially blocked by Marjorie Tillery's Tahoe. As she was about to move the Tahoe, Marjorie Tillery observed the defendant in the front passenger seat of the station wagon. She then stated to Mickey Tillery, "there go Jermaine right there."

Upon seeing the defendant in the passenger seat of the station wagon, both Tillerys exited the Tahoe and began to approach the station wagon. Although Marjorie Tillery recalled that she "came in peace,"[6] Mickey Tillery admittedly came with the intent to fight the defendant. He testified at trial that, upon seeing the defendant, "I kind of, like, lost it. I jumped out of the truck. I ran over to where he was sitting in the car . . . ." During this initial encounter, the station wagon remained stationary in its parking space, with its doors unlocked and its passenger window partially down.

As he approached the station wagon, Mickey Tillery began to argue with the defendant, saying "something about [how] I'm tired of this with my niece and then . . . like I said, I pushed him, and I just put my hands inside the car and tried to snatch him out and he yanked back." Mickey Tillery also recounted, "I put my hand inside the car so I could snatch him out the car a minute and . . . that's why I opened the [passenger] door, but they locked it and then they [rolled] their windows up, and [so] I stepped away from the car and I was just looking because I couldn't get in now that they [had] hatched the windows up and lock[ed] the door."

After the defendant locked the car's doors and rolled up its windows, Mickey Tillery took several steps away from the station wagon in an effort to lure the defendant out of the car. Several seconds later, Mickey Tillery heard the doors of the station wagon unlock, and, believing that he and the defendant were about to fight, Mickey Tillery backed away from the car to allow the defendant to exit the station wagon. The defendant then opened the front passenger side door, exited the vehicle, produced a nine millimeter semiautomatic handgun and shot Mickey Tillery, who, at the time, was stepping away from the vehicle with his hands up in the air. Mickey Tillery immediately collapsed on the

pavement. Fearing that the defendant might shoot her as well, Marjorie Tillery got back into the Tahoe. The defendant then returned to the passenger side of the station wagon and got in, after which the station wagon backed out of the parking space, drove around the Tahoe, and exited the parking lot. Immediately after the station wagon left the area, Marjorie Tillery saw Gainey exiting her neighbor's home. Although Gainey had not witnessed the shooting, Marjorie Tillery told her that the defendant had shot Mickey Tillery, who, by then, was lying unconscious near the passenger side of the Tahoe. Marjorie Tillery also dialed 911 and reported the incident to the police.

Officer Reginald E. McGlotten of the New Haven Police Department arrived first on the scene. After speaking with Marjorie Tillery, McGlotten broadcasted a description of the shooter and the station wagon over his police radio. At the time of that broadcast, Officer Gene Trotman, Jr., who was responding to the initial report of a gunshot fired on Peck Street, observed a station wagon matching the broadcast description of the shooter's vehicle traveling near the intersection of Chapel and Church Streets in New Haven. Trotman first called for backup units, then initiated a traffic stop of the station wagon. Once backup units arrived, Trotman approached the station wagon with his weapon drawn. The driver of the station wagon was identified as Akeem Whitely, and his passenger was identified as Jermaine Reddick, the defendant. Trotman asked the defendant where he was then coming from. The defendant responded that he was coming from 38 Peck Street. Trotman asked if there were any weapons in the vehicle, and the defendant stated that there were. The defendant and Whitely were then placed under arrest. A subsequent search of the station wagon revealed a nine millimeter semiautomatic handgun between the front passenger seat and the center console. Upon further questioning, the defendant stated that the gun was his and that Whitely was simply giving him a ride.[7]

Contemporaneously with this traffic stop, Officer Keron Bryce arrived at Peck Street to secure the scene with McGlotten. While securing the scene, Bryce found one nine millimeter shell casing on the pavement near Marjorie Tillery's Tahoe.[8] Bryce then interviewed Marjorie Tillery and Gainey about the events preceding the shooting. During these interviews, Bryce saw a laceration on Gainey's face and noticed that she had a swollen lip. Upon further questioning by the officer, Gainey indicated that the defendant had caused her injuries. Thereafter, Bryce was notified that Trotman had pulled over a vehicle matching the description given by Marjorie Tillery. Bryce then transported Marjorie Tillery to the intersection of Chapel and Church Streets to conduct a one-on-one showup identification of the suspect.

Once Bryce and Tillery had arrived at Trotman's loca-

tion, Bryce shined a spotlight on the defendant, who was then sitting in the backseat of a police cruiser. Upon seeing the defendant, Marjorie Tillery positively identified him as the person who had shot her brother. The defendant was then transported to the New Haven Police Department's detention facility for processing. A subsequent background check revealed that the defendant had previously been convicted of a felony.[9]

A few miles away, Mickey Tillery arrived by ambulance at Yale-New Haven Hospital. There, it was determined that the bullet had struck the femoral artery in his right leg and that he was rapidly losing blood. Doctors first performed cardiopulmonary resuscitation on Mickey Tillery, then gave him a "massive [blood] transfusion . . . ." Thereafter, doctors performed reconstructive surgery on his femoral artery to halt the loss of blood. Although the surgery proved successful, Mickey Tillery had to remain in the hospital for the next two weeks. On May 9, 2013, while still recovering in the hospital, Mickey Tillery spoke with members of the New Haven Police Department and agreed to view a photographic array of eight individuals. Upon reviewing the array, Mickey Tillery positively identified a photograph of the defendant as that of the man who had shot him.

Thereafter, by way of a long form information, the state charged the defendant with assault in the first degree in connection with the shooting of Mickey Tillery, assault in the third degree in connection with the assault of Gainey, and criminal possession of a firearm. The defendant elected a trial by jury, which took place from April 21 through April 23, 2015. At trial, the defendant argued that Mickey Tillery had been the initial aggressor in the incident between them and that he had shot Mickey Tillery in self-defense. After several hours of deliberations, the jury found the defendant guilty of all three charges. On July 10, 2015, the defendant was sentenced to a total effective term of twenty-three years in prison followed by three years of special parole. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the defendant first claims that the state violated his due process right to a fair trial because the prosecutor, during closing argument, impermissibly commented on the defendant's failure to inform Trotman when he was first interviewed that he had shot Mickey Tillery in self-defense. In support of his claim, the defendant argues that the prosecutor failed to distinguish between the defendant's prearrest and postarrest silence, the latter of which is constitutionally protected. The defendant thus argues that, by commenting on his failure to tell the police when he first spoke with them that he had acted in self-defense, the prosecutor used his postarrest silence as circumstantial evidence of his

guilt, in violation of his privilege against self-incrimination, as applied in *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).[10] The defendant claims that the challenged comments were "so egregious, so deliberate, and so calculated to defeat the constitutional right of the defendant and to abuse the authority of the office of the prosecutor that it merits . . . the reversal of the verdict, even though no objection was made at trial."[11]

The state disagrees, arguing that "the defendant's claim fails on both the law and the facts [of this case]." In support of its position, the state argues that the defendant's pre-*Miranda*[12] silence, unlike his post-*Miranda* silence, is not constitutionally protected, and thus a prosecutor is not prohibited from commenting on a defendant's pre-*Miranda* silence during closing argument. The state further argues that the trial court record does not establish when Trotman read the defendant his *Miranda* rights, and thus there is no basis for concluding that the prosecutor violated the defendant's fifth and fourteenth amendment rights under the rule of *Doyle* v. *Ohio*, supra, 426 U.S. 610. Finally, the state argues that even if the challenged comments were improper, any error based upon them was harmless and does not warrant reversal of the defendant's conviction. We agree with the state that the record does not establish when the defendant received his *Miranda* warning, and thus there is no basis upon which to conclude that the prosecutor's comments violated *Doyle*.

The following additional facts are necessary for our resolution of this claim. As discussed in the preceding paragraphs, the defendant advanced a claim of self-defense throughout the trial. In support of his claim, he attempted to establish, through his cross-examination of the state's witnesses, that Mickey Tillery was approximately six inches taller than he was and outweighed him by as much as seventy pounds.[13] On cross-examination of Mickey Tillery, the defendant elicited admissions as to his anger toward the defendant and his desire to fight him on the evening of the shooting. Mickey Tillery, in fact, agreed with defense counsel's statement that he "would have . . . beat the crap out of [the defendant]," that he would not have let anyone break up the fight, and that he did not intend to stop fighting with the defendant until he "got tired of hitting him." Defense counsel also sought to emphasize that the defendant had "tried to get away" from Mickey Tillery before the shooting occurred.

As part of its case-in-chief, the state presented the testimony of Trotman, the officer who had stopped the station wagon at the intersection of Church and Chapel Streets. Although both parties inquired of Trotman as to the sequence of events during that traffic stop, neither the state[14] nor the defendant[15] established when in that sequence the defendant was arrested, whether the

arrest preceded or followed Trotman's questioning of the defendant, whether the defendant was ever given his *Miranda* warnings, and, if so, when those warnings were given in relation to Trotman's questions.

After two days of evidence, the state rested its case-in-chief. The defendant thereafter elected to not testify in his own defense and, after being canvassed by the court as to that decision, rested his case without presenting any defense witnesses. Closing arguments were made the following day.

During closing argument, the prosecutor recounted the events leading up to the shooting, emphasizing, inter alia, that during the initial encounter, the defendant had rolled up the car's windows and locked its doors. The prosecutor then recalled for the jury that Mickey Tillery, who was unarmed, had backed away from the defendant's vehicle after its windows were rolled up. "Suddenly," the prosecutor argued, "he hears the door on the passenger's side unlock and what happens? The defendant comes out, pulls out a gun, aims it at Mickey Tillery, and fires at him, striking him in his upper right leg. . . . I mean, ask yourself, when you shoot somebody who's doing that, is that self-defense? It's not self-defense, ladies and gentlemen."

The prosecutor also discussed, without objection, the defendant's conversation with Trotman following the shooting. More specifically, the prosecutor stated: "[W]hat's said by Mr. Reddick at that time? Well, he tells Officer Trotman that he had been over at 38 Peck Street. He also tells . . . Officer Trotman that the gun was his and that Mr. Whitely was a friend of his and was just giving him a ride. That's what he told Officer Trotman. What didn't he say to Officer Trotman? You know, this is somebody who is going to now claim that he was acting in self-defense. I mean, did he say anything to Officer Trotman, you know, geez, you know . . . I was just accosted by this [madman] and I had to shoot him. Did he mention the shooting at all? He didn't mention the shooting at all. I . . . don't know how he thought he was going to get away this. But he, for whatever reason, was willing to admit that he had been over to Peck Street and that the gun was his, but he never admitted to doing any shooting or . . . that he had to shoot anybody in self-defense, never made . . . any mention of that, whatsoever." Thereafter, the prosecutor concluded his opening closing argument.

At the outset of his closing argument, defense counsel commented that "99 percent of the facts of this case are not disputed. You know what happened; it's just your interpretation of it with a couple of minor twists." Counsel then argued that Marjorie Tillery "was going [to Peck Street] for vengeance. She was going to be a vigilante. She was taking things into her own hands." Thereafter, counsel claimed that Marjorie Tillery "let [Mickey Tillery] loose" on the defendant. Counsel

argued that, at that moment, it was the middle of the night, the defendant did not recognize Mickey Tillery,[16] he was being confronted by a larger man who was attempting to pull him out of the car window and that, fearing for his safety, he shot Mickey Tillery in self-defense.

Thereafter, defense counsel argued that the state had failed to carry its burden of proof that the defendant had not acted in self-defense that night. In support of his argument, counsel reminded the jury that it could infer that (1) the defendant reasonably believed that he faced serious physical injury because Mickey Tillery admitted that he intended to seriously injure the defendant; (2) the defendant reasonably believed that Mickey Tillery may have had a weapon in the car; (3) the defendant tried to avoid the fight and "stayed in the car for as long as he could"; and (4) the defendant had not used deadly force because he had shot Mickey Tillery in the leg and fired only once before fleeing the area. Counsel then concluded his argument without addressing the state's characterization of the defendant's interaction with Trotman.

In its rebuttal argument, the state reiterated that the jury should not credit the defendant's claim of self-defense because the defendant had not told officers at the time of his arrest either that he had shot Mickey Tillery or that he had done so in self-defense. More specifically, the prosecutor argued that, "when the defendant was stopped by Officer Trotman, shortly after the shooting, you know, he didn't say, hey, geez, you know, I'm glad . . . you can't believe what just happened to me. This madman was coming at me and I had to shoot him. I thought he was going to kill me. He doesn't even mention to Officer Trotman that he shot anybody. So, this wasn't self-defense. If it was self-defense, he would have told the police right then and there what had happened. He didn't."

Before reaching the merits of the defendant's claims, we first set forth the relevant portions of our law of self-defense. "Under our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. . . . That is, [the defendant] merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt. . . . As these principles indicate, therefore, only the state has a burden of persuasion regarding a self-defense claim: it must disprove the claim beyond a reasonable doubt.

"It is well settled that under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm,

and (2) that deadly physical force is necessary to repel such attack. . . . [Our Supreme Court] repeatedly [has] indicated that the test a jury must apply in analyzing the second requirement . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) *State* v. *Abney*, 88 Conn. App. 495, 502–503, 869 A.2d 1263, cert. denied, 274 Conn. 906, 876 A.2d 1199 (2005). Under subsection (b) of § 53a-19, however, "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating . . . ." Moreover, under subsection (c) of § 53a-19, "a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ."

Against this backdrop, "[w]e set forth the legal principles that guide our analysis [of the defendant's claims] and our standard of review. In *Doyle* [v. *Ohio*, supra, 426 U.S. 610] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. . . . Likewise, our Supreme Court has recognized that it is also fundamentally unfair and a deprivation of due process for the state to use evidence of the defendant's post-*Miranda* silence as affirmative proof of guilt . . . . *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . Because it is the *Miranda* warning itself that carries with it the promise of protection . . . the prosecution's use of [a defendant's] silence *prior* to the receipt of *Miranda* warnings does not violate due process. . . . Therefore, as a factual predicate to an alleged *Doyle* violation, the record must demonstrate that the defendant received a *Miranda* warning prior to the period of silence that was disclosed to the jury. . . . The defendant's claim raises a question of law over which our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Lee-Riveras*, 130 Conn. App. 607, 612–13, 23 A.3d 1269, cert. denied, 302 Conn. 937, 28 A.3d 992 (2011); see also *State* v. *Bereis*, 117 Conn. App. 360, 373, 978 A.2d 1122 (2009).

In the present case, the defendant claims that the prosecutor's remarks during his opening and rebuttal

closing arguments violated his constitutional rights under the fifth and fourteenth amendments, as applied in *Doyle* v. *Ohio*, supra, 426 U.S. 610, not to have the exercise of his right to remain silent used against him in a later criminal proceeding. In support of his position, the defendant argues that, although "[p]ostarrest silence is treated differently from prearrest silence," the facts of this case demonstrate that "there was a period under anyone's definition of arrest during which the defendant was silent as to his exculpatory explanation . . . ." The defendant further asserts that the prosecutor failed to distinguish between the defendant's prearrest and postarrest silence, and thus the prosecutor's comments, which "encompassed the entirety of the time the defendant was under the custody of Trotman," violated the defendant's fifth and fourteenth amendment rights to remain silent. Furthermore, although the defendant concedes that Trotman did not testify as to when, if at all, the defendant received his *Miranda* warnings in the course of the traffic stop, he maintains that the right to remain silent is not contingent upon the receipt of *Miranda* warnings, but instead "inheres automatically under the fifth amendment." We are not persuaded.

At the outset, we address two fundamental flaws in the defendant's argument. We first note that, although the defendant is correct in his assertion that the right to remain silent is not contingent upon the receipt of *Miranda* warnings, "[i]t has long been settled that the privilege [against self-incrimination] generally is not self-executing and that a witness who desires its protection must claim it." (Citation omitted; internal quotation marks omitted.) *Salinas* v. *Texas*, U.S. , 133 S. Ct. 2174, 2178, 186 L. Ed. 2d 376 (2013). In the present case, however, there is no evidence to support the notion that the defendant, in the absence of any *Miranda* warning, expressly invoked his constitutional right to remain silent at any time during his encounter with Trotman.

We further note that, in support of his claim that the prosecutor violated the constitutional protections described in *Doyle*, the defendant relies upon the fact that he was either in police custody or under formal arrest when he spoke with Trotman.[17] A review of relevant federal and state case law demonstrates that the defendant's reliance on these facts is misplaced. In *Fletcher* v. *Weir*, 455 U.S. 603, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982), the United States Supreme Court summarized its evolving jurisprudence under *Doyle* by explaining that the "use of silence for impeachment was fundamentally unfair in *Doyle* because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . [Thus] *Doyle* bars the use against a criminal defendant of silence maintained *after receipt of governmental assurances*." (Emphasis

added; internal quotation marks omitted.) Id., 606. In *State* v. *Leecan*, 198 Conn. 517, 504 A.2d 480, cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986), our Supreme Court adopted the rationale of *Fletcher*, holding that "the absence of any indication in the record that the silence of a defendant had been preceded by a *Miranda* warning rendered *Doyle* inapplicable, even though the inquiry of the prosecutor pertained to the time of arrest." Id., 524–25; see also *State* v. *Berube*, 256 Conn. 742, 751–52, 775 A.2d 966 (2001); *State* v. *Plourde*, 208 Conn. 455, 467, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989).

Accordingly, our courts have recognized that the giving of *Miranda* warnings, even in the absence of a formal arrest, entitles the defendant to the *Doyle* protections because such warnings provide governmental assurance, at least implicitly, that the defendant's silence will not be used against him. See *State* v. *Montgomery*, 254 Conn. 694, 715, 759 A.2d 995 (2000). We have, however, distinguished the former cases from cases where no *Miranda* warnings were given. In so doing, we have held that the act of being placed under arrest does not, by itself, provide governmental assurance that the defendant's silence will not be used against him at a later date. E.g., *State* v. *Plourde*, supra, 208 Conn. 466–67. Thus, it is the giving of *Miranda* warnings, not the act of being placed under arrest, that cloaks a defendant with the protections of *Doyle* v. *Ohio*, supra, 462 U.S. 610. See B. Gershman, Prosecutorial Misconduct (2d Ed. 2011–2012) § 10:17, p. 416 ("[c]learly, the operative fact in *Jenkins* [v. *Anderson*, 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980)], as in *Doyle*, is the giving of *Miranda* warnings, not the arrest").

As we have long held, if a defendant alleges a constitutional violation, he bears the initial burden of establishing that the alleged violation occurred; it is only then that the state assumes the burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. See, e.g., *State* v. *Jones*, 65 Conn. App. 649, 654, 783 A.2d 511 (2001); see also *State* v. *Nasheed*, 121 Conn. App. 672, 678–79, 997 A.2d 623, cert. denied, 298 Conn. 902, 3 A.3d 73 (2010). Moreover, when analyzing a defendant's claim that a prosecutor violated the protection set forth in *Doyle*, we have held that "[i]t is essential to know the timing of these conversations because the use at trial of silence *prior* to the receipt of *Miranda* warnings does not violate due process." (Emphasis in original; internal quotation marks omitted.) *State* v. *Berube*, supra, 256 Conn. 751. In the present case, the record is unclear as to when, if at all, Trotman gave *Miranda* warnings to the defendant. Accordingly, under the present facts, "we are unable to determine whether a *Doyle* violation occurred." *State* v. *Gonzalez*, 167 Conn. App. 298, 302 n.2, 142 A.3d 1227,

cert. denied, 323 Conn. 929, 149 A.3d 500 (2016). In light of the foregoing, we conclude that there is no basis upon which to conclude that the prosecutor's comments during closing argument violated the defendant's due process rights pursuant to *Doyle* v. *Ohio*, supra, 426 U.S. 610. In so concluding, we need not address the subsequent question of whether such violation, if established, was harmless beyond a reasonable doubt. Cf. *State* v. *Montgomery*, supra, 254 Conn. 717–18.

## II

The defendant's final claim on appeal is that the prosecutor committed several improprieties in closing argument that combined to deprive him of his due process right to a fair trial. More specifically, the defendant argues that the prosecutor impermissibly (1) voiced his personal opinion as to Gainey's credibility; and (2) appealed to the emotions of the jury by referencing the recent trend of increasing gun violence in New Haven and repeatedly referring to the defendant as a "convicted felon" and a "predator . . . ." The defendant claims, on the basis of such alleged improprieties, that he is entitled to the reversal of his conviction on all charges and a new trial.

In response, the state first argues that the defendant misquotes the record and misrepresents the context in which the prosecutor's challenged comments were allegedly made. It thus argues, as a threshold matter, that the prosecutor's comments, when properly understood, were not improper because (1) the comments as to Gainey's credibility were "based in the evidence and the reasonable inferences drawn therefrom"; (2) the comments about gun violence in New Haven only referred to facts about which the jurors had common knowledge, and the prosecutor never suggested that by finding the defendant guilty, the jury could somehow lessen the problem of gun violence; and (3) the prosecutor's comments regarding the defendant's felony conviction were true in fact, supported by the record, and relevant to a substantive issue in the case. Finally, the state argues that, "to the extent that this court finds any impropriety, the defendant has failed to demonstrate a violation of his right to a fair trial."

Before addressing the defendant's individual claims of impropriety, we set forth our standard of review and governing legal principles. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . . In analyzing whether the prosecutor's comments deprived the defendant of a fair trial, we generally determine, first, whether the [prosecutor] committed any impropriety and, second, whether the

impropriety or improprieties deprived the defendant of a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 8–9, 124 A.3d 871 (2015). Put differently, "[impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) Id., 9, quoting *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006); see also *State* v. *Ciullo*, 314 Conn. 28, 35, 100 A.3d 779 (2014). "[T]he burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 620, 65 A.3d 503 (2013). "As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)]."[18] (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 362.

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 611–13. With these general principles in mind, we address each of the defendant's arguments.

## A

### Gainey's Credibility

The defendant first argues that the prosecutor usurped the jury's role in assessing Gainey's credibility, instead "[making] that determination for the jury" by offering his personal belief that she had lied under oath regarding her injuries. The following additional facts are necessary for our resolution of this claim.

From the outset of her direct examination, Gainey admitted, inter alia, that she was still in love with the defendant, she did not wish to testify, and she was testifying only because she had been served with a subpoena. Throughout the course of her examination, she vehemently denied that the defendant had hit her on the evening of the shooting or that he was, in any way, responsible for the bruises and cuts she sustained that evening. Rather, she maintained that, although she could not recall what she had had to drink that evening, she was heavily intoxicated, as a result of which she had fallen down her stairs. Gainey stated that, despite informing the police after the shooting that she had fallen down the stairs, she had been pressured into giving a statement implicating the defendant, and thus had lied in her statements to police.[19] She also denied telling either her neighbor or the police that the defendant had hit her that evening.

After Gainey became increasingly unresponsive to the state's questions during the trial, the court permitted the prosecutor to examine her as a hostile witness. Thereafter, the prosecutor introduced into evidence a redacted video[20] of Gainey's April 29, 2013 interview with the New Haven police. In that interview, Gainey told the police, inter alia, that the defendant had struck her several times in the face, and that she had attempted to fight back and, thereafter, had run over to her neighbor's house and told her neighbor about the defendant's physical abuse.

During his initial closing argument to the jury, the prosecutor argued, inter alia, that Gainey had violated her oath to testify truthfully as to the source of her injuries that night. In support of that argument, the prosecutor reminded the jury that Gainey had told the police that the defendant had struck her several times in the face that evening, but she had never mentioned falling down the stairs. The prosecutor then asked the jury to recall Gainey's demeanor while testifying and her admission that she was testifying only because the state had subpoenaed her. In an attempt to explain why Gainey had offered two drastically different accounts as to the source of her injuries, the prosecutor stated, "[w]ell, people don't come into court and lie just for the heck of it. I mean, I guess there . . . are pathological liars that might do that; I'm not claiming that Ms. Gainey is that type of person. You know, she came in here. She admitted that she's in love with the defendant. She has a young daughter by him. The state would submit, use your common sense on that issue. Her moti-

vation for fabricating here in court about how she got hurt was because she was trying to help Mr. Reddick. But, again . . . for you to make that decision, you'd had an opportunity to review and see her actual interview at the New Haven Police Department the night of that incident. She was coherent. She answered questions in a manner that was appropriate. She did not have slurred speech. She never asked to use the bathroom. There was absolutely no evidence whatsoever that during that interview that she was intoxicated or drunk, nothing. So, she came in here and there were some things that had a kernel of truth to it, but for the most part, as far as how she got injured that night, she did not want to blame that on Mr. Reddick because she was trying to protect him and that's what she did. You know, she's a victim of domestic abuse. She'll take a beating and not report it to the police. She's blinded by her love for the defendant and . . . [her] feelings for him. She's unable to protect herself from this abuse. She's . . . unable to prevent her daughter from seeing it happen. But, you know, unfortunately, she's blinded by her feelings for the defendant."

It is well established that, although "[a] prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses . . . [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 40–41. Moreover, we have held that "[i]t is permissible for a prosecutor to explain that a witness either has or does not have a motive to lie." *State* v. *Ancona*, 270 Conn. 568, 607, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). In the present case, the prosecutor's comments did not amount to statements of personal opinion as to whether Gainey was, in fact, lying. Rather, the prosecutor argued that Gainey had presented two drastically different accounts as to how she was injured on the evening of the shooting, that she was biased by her feelings for the defendant, and that she had a motive to testify favorably for the defense. From those facts, the prosecutor asked the jury to "use [its] common sense on that issue" and to reject Gainey's claim that she had fallen down the stairs that night. Such argument does not amount to prosecutorial impropriety; "instead, the prosecutor's statements, when placed in the context in which they were made, are reasonable inferences the jury could have drawn from the evidence adduced at trial." *State* v. *Ciullo*, supra, 42. Because we conclude that the defendant's first claim does not amount to prosecutorial impropriety, we need not consider whether it "caused or contributed to a due process violation . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 362.

### Appealing to Jurors' Emotions

The defendant's final argument on appeal is that the prosecutor improperly appealed to the jurors' emotions (1) by arguing that the defendant's conduct was "another example of the unnecessary and senseless gun violence that's become all too common [in] the city of New Haven"; and (2) by engaging in character assassination of the defendant by referring to him as "a predator" and "a convicted felon . . . [who] doesn't care about the law." The state responds that the prosecutor's comments about gun violence in New Haven were not improper or, alternatively, that they did not violate the defendant's right to a fair trial. As to the defendant's remaining claim, the state first argues that the word "predator" was never used to describe the defendant, but instead was used to describe the kind of person, unlike Mickey Tillery, against whom the defendant might have needed to use deadly force in self-defense. The state further argues that the prosecutor's comments about the defendant being a convicted felon properly referred to the evidence presented and the reasonable inferences that could be drawn therefrom. We address each argument in turn.

We first address the prosecutor's comment regarding general patterns of gun violence in New Haven. At the close of the prosecutor's initial remarks to the jury, the prosecutor summarized the events surrounding the shooting and the defendant's ability, but unwillingness, to leave the area safely before he shot Mickey Tillery. In that regard, the prosecutor stated that "what this case is, *it's another example of the unnecessary and senseless gun violence that's become all too common in the city of New Haven*. That's what this is. This defendant was not justified in using deadly physical force against Mickey Tillery. This was not self-defense, ladies and gentlemen. The defendant didn't shoot Mickey Tillery to protect himself. He was angry at Mickey Tillery for intervening in this domestic abuse situation he had going on with Myesha [Gainey]. He became angry. He was going to teach him a lesson. Mind your own business, stay out of the relationship. He taught him a lesson, all right." (Emphasis added.)

As discussed in the preceding paragraphs, "a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 613. Accordingly, "the prosecutor should refrain from injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict . . . ." (Internal quotation marks

omitted.) A. Spinella, Connecticut Criminal Procedure (1985) p. 713, quoting *State* v. *Gold*, 180 Conn. 619, 659, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). Here, we agree with the defendant that the prosecutor's reference to broader issues of gun violence in New Haven was improper because it was extraneous and irrelevant to the issues before the jury.

We turn next to the defendant's argument that the prosecutor engaged in character assassination. We first dispose of the defendant's subsidiary claim that the prosecutor violated his right to a fair trial by referring to the defendant as a "predator" in closing argument. Simply stated, he did not. Instead, as the state has argued, the prosecutor used that word only when he argued as follows: "[T]his is not a typical self-defense claim. You know, typically we think of self-defense, you know, someone minding their own business, doing nothing they shouldn't be doing and *being accosted by some predator* who sets upon them and . . . they have this confrontation with the predator, they're forced to protect themselves. That's not what happened here." (Emphasis added.) It is thus readily apparent that, when using the term "predator" in his closing argument, the prosecutor was not referring to the defendant. Accordingly, we conclude that this comment was not improper.

Finally, we address the prosecutor's references to the defendant's prior felony conviction during his opening and rebuttal closing arguments to the jury. In his opening argument, the prosecutor recalled for the jury that Officer Bryce had testified that he had performed a background check on the defendant and learned "that the defendant had been previously convicted of a felony." When summarizing the evidence supporting count two, criminal possession of a firearm, he argued that the defendant had admitted that it was his gun, the gun was found in an operable condition, and that "Mr. Reddick, who is a convicted felon, had no right to have that weapon that evening." The defendant did not object to these remarks.

In his rebuttal argument, however, the prosecutor made two additional references to the defendant's felony conviction for very different purposes. On the first occasion, he argued that the defendant's claim of self-defense should be rejected because the defendant "created this situation" by assaulting Gainey and then remaining at Peck Street, knowing that Gainey's family "wasn't going to stand for that." "Right after the beating," the prosecutor remarked, "what did [the defendant] do? . . . He arms himself with a nine millimeter semiautomatic pistol, which, originally, had seventeen live rounds. You know, he was ready for trouble. He was locked and loaded.

"He was a convicted felon. He knew he couldn't have that gun. He doesn't care about the law. You think [he]

cared about the law when his fists were smashed into his girlfriend's face? He didn't care. He doesn't care. He knew that there was going to be consequences for his actions. . . . [I]f he thought that the family or Myesha [Gainey] were going to call the New Haven police, do you think he would have been sitting with a nine millimeter fully loaded pistol waiting for the New Haven police to show up? I don't think so."

On the second occasion, the prosecutor referenced the defendant's felony conviction while discussing the circumstances immediately preceding the shooting. Specifically, he remarked that the defendant was able to lock the doors and windows to the station wagon, after which "[h]e could have had his buddy drive away" or, alternatively, he could have displayed the pistol and told Mickey Tillery, "look, stay the hell away from me." Had he pursued either of those alternative courses, the prosecutor argued, "[h]e could have went up to his apartment at 38 Peck Street, locked the door, and called the police. Did he do that? No. Well, he's not going to do that because he's a convicted felon in the possession of a pistol." Thereafter, the prosecutor concluded his closing argument by stating, inter alia: "So I want . . . you to consider all of those things that he could have done. . . . [T]his was not a necessary shooting because this shooting was not self-defense. That's not what the shooting was about. It was motivated by the defendant wanting to teach the Tillery family a lesson." The defendant voiced no objection to any of these comments.

The parties do not dispute that "[e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove . . . an element of the crime. . . ." Conn. Code Evid. § 4-5 (c); see also, e.g., *State* v. *James*, 69 Conn. App. 130, 135, 793 A.2d 1200, cert. denied, 260 Conn. 936, 802 A.2d 89 (2002); *State* v. *Hanks*, 39 Conn. App. 333, 344, 665 A.2d 102, cert. denied, 235 Conn. 926, 666 A.2d 1187 (1995). In this case, the prosecutor's comments during his opening closing argument merely summarized Bryce's unobjected-to testimony that the defendant had, in fact, been convicted of a felony, which was an essential element of the charge of criminal possession of a firearm.[21] We conclude, therefore, that this remark was wholly proper, and obviously did not constitute prosecutorial impropriety.

We conclude, however, that the prosecutor's further commentary regarding the defendant's prior felony conviction was improper. It is well established that "[a] prosecutor may not appeal to the emotions of the jurors by engaging in character assassination and personal attacks against . . . the defendant . . . ." *State* v. *Warholic*, supra, 278 Conn. 389. As discussed in the preceding paragraphs, "[The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the

[s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) *State* v. *Medrano*, supra, 308 Conn. 612. Thus, "[a]lthough a state's attorney may argue that the evidence proves the defendant guilty, he may not stigmatize the defendant by the use of epithets which characterize him as guilty before an adjudication of guilt." (Internal quotation marks omitted.) Id., 615.

In its brief to this court, the state attempts to walk a fine line by arguing that the prosecutor's comments did not suggest that the defendant did not care about the law *merely because he was a convicted felon* but, instead, suggested that the defendant did not care about the law because, despite the fact that he had previously been convicted of a felony, he assaulted his girlfriend, illegally armed himself with a nine millimeter pistol, and waited for the eventual confrontation with Mickey Tillery. We are unpersuaded.

As previously discussed, the defendant did not testify in this case, and thus his prior felony conviction could not be used to challenge the veracity of his testimony. See Conn. Code Evid. § 6-7 (b). Accordingly, the prosecutor could only use evidence of the defendant's prior conviction to establish an essential element of a crime or by utilizing another recognized exception under § 4-5 of the Connecticut Code of Evidence. His comments, however, suggested that the defendant, a convicted felon, was not a law-abiding citizen, and thus had a propensity to engage in the type of criminal conduct for which he had been charged. Our Code of Evidence unequivocally prohibits the use of prior convictions to establish a defendant's propensity for criminal behavior. Conn. Code Evid. § 4-5 (a); see, e.g., *State* v. *Ellis*, 270 Conn. 337, 354, 852 A.2d 676 (2004). We thus agree with the defendant that these comments were also improper.

"Having determined that several of the prosecutor's statements were improper, we now turn to whether the defendant has proven that the improprieties, cumulatively, 'so infected the trial with unfairness as to make the [conviction] a denial of due process.' " *State* v. *Medrano*, supra, 308 Conn. 620. "To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been

different absent the sum total of the improprieties. . . . This inquiry is guided by an examination of the following *Williams* factors: the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 396.

With respect to the first *Williams* factor, there is nothing in the record before us to suggest that the prosecutor's comments about gun violence in New Haven or the defendant's felony conviction were invited by the defendant's conduct or argument.[22] Next, with respect to the second *Williams* factor, the severity of the improprieties, we agree with the state that the prosecutor's remarks regarding gun violence in New Haven did not go so far as to "imp[ly] that convicting the defendant would alleviate the gun violence in New Haven." Moreover, although we conclude that the prosecutor's comments regarding the defendant's felony conviction were improper, we are cognizant that the defendant failed to object, at any point, to the remarks now at issue. As we have repeatedly held, "the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]. When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 361.

With respect to the third *Williams* factor, the frequency of the alleged improprieties, we note that the prosecutor's comment regarding gun violence in New Haven was an isolated remark and was not part of a larger pattern or theme in the state's case. Cf. *State* v. *Ceballos*, 266 Conn. 364, 411, 832 A.2d 14 (2003). As for the frequency of his comments regarding the defendant's felony conviction, these questionable comments occurred only twice, and thus we conclude that the frequency of these comments does not rise to the level of the frequency of impropriety that was identified and admonished by our Supreme Court in *State* v. *Williams*, supra, 204 Conn. 547.

As to the fourth *Williams* factor, whether the challenged comments touched upon the central issues before the jury, we agree with the state that, with respect to the defendant's claim of self-defense, the central issue was whether the jury credited the Tillerys' account of what transpired on the evening of the shooting. Against that background, we conclude that the pros-

ecutor's comment regarding gun violence in New Haven had little, if any, relation to that issue, and thus did not strike at the central issues of this case. As for his comments regarding the defendant's felony conviction, however, we believe that such comments did touch upon the central issue of self-defense, and thus we resolve the fourth *Williams* factor in the defendant's favor.

As for the fifth *Williams* factor, the strength of the curative measures adopted, we note that the defendant did not request, and the court did not give, any curative instruction to the jury that it should disregard any of the prosecutor's improper comments. Although the court instructed the jury, with respect to the elements of criminal possession of a firearm, that "the state must prove beyond a reasonable doubt, number one, that the defendant possessed a firearm and, number two, that he was prohibited from possessing a firearm at the time because he was convicted of a felony," the court did not provide any limiting instruction concerning the prosecutor's improper remarks about the defendant's felony conviction. With respect to his comments on gun violence in New Haven, the court instructed the jury only generally, that "[y]ou may not go outside the evidence introduced in court to find the facts. This means you may not [resort] to guesswork, conjuncture, or suspicion, and you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. . . . Arguments by counsel are not evidence. . . . What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence." We conclude that these instructions were sufficient to cure any prejudice resulting from the prosecutor's improper comment regarding gun violence in New Haven. See, e.g., *State* v. *Williams*, supra, 204 Conn. 534 ("Absent a fair indication to the contrary, the jury is presumed to follow the court's instructions. . . . There is nothing in this record to suggest that it did not do so." [Citation omitted.]).

Finally, we emphasize that, with respect to the sixth *Williams* factor, the strength of the state's case, the state's case against the defendant was strong. During its case-in-chief, the state presented, inter alia: (1) testimony of two eyewitnesses to the shooting, who testified consistently that Mickey Tillery had his hands raised and was moving away from the defendant and his vehicle when the defendant emerged from the station wagon and shot him; (2) photographic and testimonial evidence demonstrating that the location of Marjorie Tillery's Tahoe did not prevent the station wagon from leaving the parking lot had the defendant attempted to do so; (3) testimony that the defendant made inculpatory statements to the police officers shortly after the shooting; and (4) forensic evidence linking the gun found in the defendant's possession to the shell casing recovered at the scene. As such, the remaining issue

to be decided was whether the defendant acted in self-defense. As more fully explained throughout this opinion, however, the facts elicited throughout the state's case-in-chief substantially undercut the defendant's claim that he shot Mickey Tillery in self-defense.[23]

As previously stated, "when a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). Considering the strength of the state's case, the infrequency with which the improper comments were made, and the defendant's failure to object to any of the comments with which he now takes issue, we conclude that the defendant has not demonstrated that, "in the context of the entire trial"; *State* v. *Williams*, supra, 204 Conn. 538; the prosecutor's improper comments "rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 396; see also *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In view of this court's policy of protecting the privacy interests of juveniles, we refer to the child involved in this matter as J. See, e.g., *Frank* v. *Dept. of Children & Families*, 312 Conn. 393, 396 n.1, 94 A.3d 588 (2014).

[2] At trial, Gainey claimed that she intended to call her mother because she was too drunk to care for J. Tillery and the victim, her brother, Mickey Tillery, however, stated that Gainey called her mother that evening because the defendant had struck her in front of J.

[3] Marjorie Tillery also testified that she wanted her brother to accompany her "in case [the defendant] wanted to disrespect me in a sense . . . [to make] sure everything would be all right once [we] got there."

[4] At trial, Gainey testified inconsistently regarding the plan to meet at Lombard Street that evening. Gainey first testified that, after she had called her mother, she traveled to Lombard Street and waited with J on the front porch of a friend's house before returning to Peck Street. Upon further questioning, Gainey testified that she never made it to her friend's house, but instead had walked approximately halfway to Lombard Street before she returned to Peck Street. Thereafter, she stated that she had gone to her neighbor's home following her argument with the defendant, and was inside that neighbor's home when her mother arrived at Peck Street.

[5] Although Marjorie Tillery testified that she first traveled to Lombard Street before heading to Peck Street, Mickey Tillery testified that they traveled directly from West Haven to Peck Street, New Haven.

[6] At trial, Marjorie Tillery testified that she "just wanted to talk to [the defendant] and ask him, you know, why [the defendant continued] to keep on doing what he [was] doing to my daughter knowing my granddaughter, which is his daughter, is there to see all that."

[7] As we will discuss more fully, the parties agree that the record does not clearly establish the chronology of Trotman's traffic stop or his questioning of the defendant. Notably, there is no indication of whether the defendant was arrested prior to or after answering Trotman's questions or when, if at all, the defendant received his warnings pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), during this encounter.

[8] On the second day of trial, Jill Therriault, a firearms and toolmark examiner with the state Department of Emergency Services and Public Protection's division of scientific services, testified that forensic testing confirmed

that the shell casing discovered at Peck Street was fired from the nine millimeter handgun later recovered in the defendant's possession.

[9] During the state's direct examination of Bryce, the following colloquy occurred:

"Q. Finally, sir, as part of your duties or responsibilities in this case, did you have occasion to do a background check for the defendant, Mr. Jermaine Reddick . . . to determine whether or not he had been previously convicted of a felony? Did you do such a check? . . .

"A. Yes.

"Q. All right. And after doing that check, did you confirm that Mr. Reddick, in fact, had been previously convicted of a felony before that date?

"A. Yes."

The defendant did not object to this line of questioning or request a limiting instruction as to the permissible use of such prior conviction evidence.

[10] The defendant also claims that the prosecutor's comments violated General Statutes § 54-84 (a), which provides in relevant part: "Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official . . . ."

A review of the record, however, demonstrates that the prosecutor never commented on the defendant's decision not to testify during trial. We thus reject this alternative argument.

[11] It is well settled that a defendant may raise a claim of prosecutorial impropriety on appeal even though he failed to object to the alleged impropriety at trial. See, e.g., *State* v. *Stevenson*, 269 Conn. 563, 573–74, 849 A.2d 626 (2004).

[12] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[13] At several points during the trial, the defendant claimed that Mickey Tillery was six feet tall and weighed 240 pounds. On direct examination of Dirk Johnson, a physician at Yale-New Haven Hospital, the state entered into evidence exhibit 25, a medical report dated May 7, 2013, which listed Mickey Tillery's height at five feet, eleven inches and his weight at 219 pounds. On cross-examination, Gainey agreed with defense counsel that the defendant was approximately five feet, six inches tall and weighed 170 pounds.

[14] During the state's direct examination of Trotman, the following colloquy occurred:

"Q. Okay. Now . . . after you stopped the vehicle . . . did you ask Mr. Reddick any questions, sir?

"A. Yes, I asked him where he was coming from.

"Q. Okay. And do you remember what, if anything, he told you about that?

"A. Yes, he said he was coming from 38 Peck.

"Q. Okay. Now, after you discovered the handgun . . . did Mr. Reddick indicate who that gun belonged to?

"A. Yes, he said it was his.

"Q. And concerning Mr. Whitely's involvement in this incident, what did he say, if anything, about Mr. Whitely?

"A. He said Mr. Whitely was just giving him a ride and that the gun belonged to him.

"Q. So, at this point, were both Mr. Whitely and Mr. Reddick . . . were they both detained and placed under arrest, sir?

"A. Yes."

[15] On cross-examination of Trotman, the following colloquy occurred:

"Q. When you spoke to Mr. Reddick, you asked him where he was coming from. Correct?

"A. Yes.

"Q. And he told you 38 Peck Street.

"A. Yes.

"Q. And that's, in fact, where he was coming from. Correct?

"A. Yes.

"Q. And . . . did you ask him whose gun is that?

"A. I don't recall . . . I think it was more . . . that he didn't want the driver to get in trouble for what he did. I don't recall how it came about, but he did say that . . . it was his gun.

"Q. And were you the one that stopped him?

"A. Yes.

"Q. All right. . . . [Did] you have your weapon drawn when you . . . stopped him?

"A. Yes.

"Q. All right.

"A. Yes.

"Q. Did you ask him if he had any weapons in the car?

"A. Yes.

"Q. And did he say yes?

"A. I don't recall.

"Q. Okay. At some point he said yes. Correct?

"A. Yes.

"Q. He . . . indicated . . . that it was his weapon.

"A. Yes.

"Q. All right. And do you know the person who was shot in this case? Do you know his name? . . .

"A. No, it's not in my notes. I had nothing to do with that part of the investigation.

"Q. Okay. So, all you did was stop him, arrest him, and bring him to . . . Union Station. Correct?

"A. No, I . . . stopped and I waited until the primary officer that was at the scene of the crime—until he came and then he did what he had to do. . . .

"Q. And then . . . you left.

"A. Yes.

"Q. Went on with other things.

"A. Yup."

[16] Although the defendant's argument suggested that he did not recognize Mickey Tillery, both Tillerys testified that the two men had met each other prior to April 29, 2013.

[17] Although "[e]vidence of a defendant's postarrest silence is inadmissible under the principles of the law of evidence . . . a defendant must seasonably object and take exception to an adverse ruling in order to obtain appellate review of his claim of error in this respect." (Internal quotation marks omitted.) *State* v. *Lee-Riveras*, supra, 130 Conn. App. 613 n.7. As the state correctly notes, the defendant has not raised an evidentiary claim regarding the state's use of the defendant's postarrest silence.

[18] See part II B of this opinion.

[19] As we have discussed, the state also called Officer Bryce during its case-in-chief. During his examination, Bryce testified that, while interviewing Gainey that evening, he became interested in locating the defendant in connection with her bruises. Bryce also stated that Gainey never mentioned that she had fallen down the stairs.

[20] Pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the court admitted only those portions of the taped interview that concerned the cause of Gainey's injuries on the evening of the shooting.

[21] Pursuant to General Statutes § 53a-217 (a): "A person is guilty of criminal possession of a firearm . . . or . . . electronic defense weapon when such person possesses a firearm . . . or . . . electronic defense weapon and . . . has been convicted of a felony . . . ."

We note that although § 53a-217 has been amended since the events at issue here, those amendments are not relevant to this appeal. We therefore refer to the current revision of § 53a-217.

[22] During closing argument, defense counsel argued, "[the prosecutor] may be right. You may feel the same way. You're sick of the gun violence . . . in New Haven. This case is not a referendum on gun violence. It's not. This case is about Mr. Reddick defending himself against someone who was going to cause him serious physical injury." We are cognizant, however, that these comments occurred after, and in response to, the prosecutor's comments in closing argument.

[23] Such facts included, inter alia, the lapse of time between the initial confrontation and the second confrontation between the defendant and Mickey Tillery; Whitely's ability to drive the station wagon around Marjorie Tillery's truck and exit the parking lot; the fact that Mickey Tillery was unarmed; and the fact that Mickey Tillery was backing away from the vehicle with his hands raised when the defendant voluntarily emerged from the station wagon and shot him.