******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANGELA C. GRASSO
(AC 41167)

Sheldon, Keller and Moll, Js.

*Syllabus*

Convicted of the crime of manslaughter in the first degree with a firearm, the defendant appealed, claiming, inter alia, that the state failed to disprove beyond a reasonable doubt that she acted in self-defense, pursuant to statute (§ 53a-19), when she shot the victim while he was driving the vehicle in which they were riding. The defendant, an employee of a bail bonds company, was romantically involved with the victim, and helped him financially by paying for rental automobiles when his vehicle needed repairs, and by giving him money to pay bills, rent and car repair expenses. On the day before the shooting, the victim accused the defendant of wanting to have sexual relations with his sister, and became violently angry and threatened the defendant's life. The next day, he sent the defendant text messages in which he repeatedly threatened to kill her and made statements to her that he would kill members of her family. He accused her of cheating on him and suggested that he had contracted a sexually transmitted disease from her. He repeatedly demanded money from the defendant and suggested that he would retaliate against her by exposing negative information that she had shared with him about the bail bonds company, which would jeopardize her employment there. The defendant thereafter visited a friend, Q, who knew the victim, and asked Q to intervene on her behalf because the victim was threatening her. During the defendant's conversation with Q, the victim called the defendant's cell phone, screamed that he was going to kill her and stated that he had guns everywhere. After the victim demanded that the defendant meet him to give him money, the defendant drove to a bank but did not transact any business there, and she told the victim that she could not get any money because the bank was closed. After the victim drove to the bank and spoke to the defendant, she parked her car at a nearby restaurant and got into the victim's vehicle. The victim drove them to a medical clinic to be tested for sexually transmitted diseases, but a security guard informed them that the clinic was closed. Thereafter, the victim and the defendant left, with the victim driving. As they approached a restaurant, the victim took his attention away from the defendant, who retrieved a handgun from her purse and shot the victim. The defendant later told the police that she shot the victim because he had told her that he was going to drive to her home, kill her family members in her presence and then kill her. She claimed that shooting the defendant in the car was her last chance to stop him from killing her and her family. *Held*:

1. The state demonstrated beyond a reasonable doubt that the defendant did not use deadly physical force in self-defense and that, at the time of the shooting, the victim's use of deadly physical force was not imminent, the evidence having supported a finding that the defendant did not subjectively believe that the victim was about to use deadly physical force against her or that her use of deadly physical force was necessary to protect her physical well-being: it was reasonable for the jury to find that the defendant shot the victim to prevent him from continuing to blackmail her or harming her employment at the bail bonds company, as their text messages in the hours prior to the shooting reflected her recognition of the seriousness of the victim's threats to reveal information about the bail bonds company that could harm her employment, she labeled the victim a snitch who had betrayed her trust, she expressed deep concern about her ability to continue to care for herself and her children financially in light of the victim's threats, she told her former boyfriend that she would be dead or in jail soon, she made clear to the victim that she would have nothing to live for if he took away her way to work, and she expressed thoughts about her mortality when she told the victim that her children would be able to collect extra life insurance money if she died a tragic death; moreover, it was undisputed that the defendant voluntarily got into the victim's automobile prior to the

shooting, she failed to use her cell phone to summon assistance during the lengthy period of time in which she was with the victim prior to the shooting, the state presented evidence that tended to undermine her version of the events at issue concerning her meeting with Q and her failure to withdraw money from the bank, and the evidence supported a finding that the defendant's use of deadly physical force was premature, as it was reasonable for the jury to conclude that, at the time of the shooting, the victim's threat to shoot her and members of her family reflected his intent to use deadly physical force at a future time, the defendant's claim was premised on a definition of imminent that she did not advance in her written request to charge and that was not provided to the jury, there was no evidence that the victim was using deadly physical force against her when she shot him, the shooting occurred in a location that was not in close proximity to the defendant's residence, and she acknowledged that she did not know if the victim was in possession of a gun that day.

2. The defendant could not prevail on her unpreserved claim that her rights to due process and to the effective assistance of counsel were violated when the trial court denied the jury's request to rehear the closing arguments of the prosecutor and defense counsel, the defendant having waived that claim when defense counsel failed to object to the court's proposed response to the jury's request and affirmatively stated that he did not object to the court's response.

Argued October 12, 2018—officially released April 9, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder and manslaughter in the first degree with a firearm, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Crawford, J.*; verdict and judgment of guilty of manslaughter in the first degree with a firearm, from which the defendant appealed. *Affirmed*.

*Alice Osedach*, senior assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Vicki Melchiorre*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Angela C. Grasso, appeals from the judgment of conviction, rendered following a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a.[1] The defendant claims that (1) the state failed to disprove beyond a reasonable doubt that she had acted in self-defense and (2) the trial court violated her rights to due process and to the effective assistance of counsel by denying the jury's request to rehear the closing arguments of the prosecutor and defense counsel at trial. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. One evening in mid-March, 2014, the defendant stopped into a bar in Hartford, where she encountered an acquaintance, the victim, Jose Mendez. She had not spoken with the victim in many years. The defendant and the victim made eye contact, recognized one another, and engaged in light conversation. The victim flirted with the defendant, and he asked her for her telephone number. The defendant declined to give her number to the victim and stated to him that she was not interested in dating anyone. Then, the defendant and the victim parted ways.

At the time of the events underlying this appeal, the defendant had been employed for four years as a bail bondsperson by a bail bonds company. The day after the defendant spoke with the victim at the bar in Hartford, the defendant was in front of a Hartford courthouse distributing business cards for the bail bonds company by which she was employed, when she encountered the victim as he was exiting the courthouse. The victim then told the defendant that he might be in need of her professional services, and the defendant gave him her telephone number. Soon thereafter, the defendant and the victim spoke on the telephone and exchanged text messages. Before long, the victim expressed his romantic interest in the defendant, telling her that he had always had "a crush" on her and that she was "the woman of [his] dreams." On both days of the weekend that followed, the defendant drove to Hartford and spent time alone with the victim.

Thereafter, the defendant and the victim saw each other often. The victim expressed his desire to be in a romantic relationship with the defendant. In the defendant's words, the victim told her "all of the things that a girl would want to hear . . . ." This included his desire to help support her financially, to live with her, and to marry her. After the first week, their relationship became sexual in nature. The defendant permitted the victim to spend the night with her at her home, but only after her two young children had fallen asleep.

Approximately one week after the relationship began,

the victim, who was unemployed, told the defendant that his automobile needed to be repaired. The defendant paid for a rental automobile for the victim to use from March 28 through March 31, 2014. After the victim returned the rented automobile, however, his automobile needed additional repairs. The defendant then paid for a second rental automobile for the victim to use from April 2 through April 9, 2014.[2]

The defendant told the victim that she was not rich and could barely afford to pay her rent. She said that she was "obsessed" with money because, only a few months before she began her relationship with the victim, she was having difficulty obtaining food for herself and her children. Nevertheless, the defendant spent in excess of $500 on automobile rentals for the victim's benefit. In that same time frame, moreover, the defendant gave the victim $1000 after he told her that he needed money with which to pay his bills, rent, and car repair expenses.

During the morning of April 8, 2014, while repairs were being made to a tire on the defendant's automobile, the victim and the defendant visited the victim's sister at her home. Prior to the visit, the victim told the defendant that it would be nice if she befriended his sister. When the visit was over, however, the victim accused the defendant of flirting with his sister and wanting to have sexual relations with her, which the defendant vehemently denied. As the victim drove the defendant from his sister's residence to the repair facility to retrieve her automobile, he became violently angry. He called the defendant a "stupid bitch," threatened her life if she ever touched his sister, and spat in her face. While he was driving on the highway, he tossed her cell phone out of the moving automobile. Soon after she retrieved her automobile, the defendant went to a store and obtained another telephone.

The victim and the defendant spoke again later that day. The victim apologized to the defendant and explained that a prior girlfriend of his had engaged in a sexual relationship with his sister. The defendant visited the victim later that day. In text messages exchanged between the defendant and the victim during the evening hours of April 8, 2014, into the early morning hours of April 9, 2014, both the defendant and the victim questioned their relationship. The victim suggested that the defendant find someone who could "buy and give [her] the world" and think about whether she really wanted to be with him. The defendant expressed her frustration with the way the victim was treating her. She told him that she was upset with him and that her hands were still shaking as a result of his behavior earlier that day. She said that, despite the fact that the victim claimed to love her, he did not really know her and that he was causing her pain. In her text messages to the victim late in the evening on April 8, 2014, the

defendant suggested that the victim was welcome to come over to her house. He did not do so.

Shortly after 7 a.m. on April 9, 2014, the victim sent the defendant a text message in which he wished her a good morning. When the defendant did not reply immediately, the victim accused her of being with another man, told her to enjoy her life, and told her that he would leave the rental automobile in his aunt's driveway. The defendant replied that she had not been with anyone and did not reply immediately to his text message because she was taking a shower. The defendant remarked that the victim was "paranoid." The defendant drove her son to school and ran an errand for work. In numerous telephone calls and text messages throughout the day, the disagreement between the defendant and the victim continued to escalate.

In a series of text messages sent by the victim to the defendant at or about 8:55 a.m., he called the defendant a "nasty bitch . . . ." He threatened to crash the automobile she had rented for him and mockingly observed that his doing so would ruin her credit. The defendant called the victim a "little boy" and warned him not to threaten her.[3] She stated that although she had spent $1500 on him, she had learned his "[true] colors."

Shortly thereafter, the victim sent the defendant another threatening text message, this time suggesting that he was going to disclose sensitive information that would hurt the company for which she worked, thereby jeopardizing her employer, her continued employment, or both. He warned her not to turn to the police for help.[4] In reply, the defendant told him to return the rented automobile.

The victim once again accused the defendant of cheating on him. He suggested that he had contracted a sexually transmitted disease from her and that they should both be tested. The victim once more suggested that he would retaliate against her by exposing negative information that she had shared with him about the bail bonds company for which she worked.[5] In a text message, the defendant attempted to defuse the victim's anger. She replied that he was not thinking clearly, she had never cheated on him, and they should act like adults. The defendant implored the victim to permit her to continue to earn a living.[6]

In text messages that followed, the victim suggested that he was about to disclose damaging information about her employer. He swore that he would "pull up [in] front of the court house and put u down to all the bondsman out there," adding, "try me I have the pictures and texts to back it up . . . ." When the defendant asked what she had done to the victim, he replied by demanding an additional $600 from her.[7]

Despite the victim's repeated threats to reveal detrimental information about the bail bonds company, the

defendant did not ask the victim what information he was threatening to reveal or otherwise reflect confusion with respect to his threat. Instead, the defendant referred to the victim as a "snitch," and reminded him that she already had given him both money and a place to stay.[8] The victim assured her that she would not leave him stranded without money or an automobile. After the defendant and the victim spoke on the telephone, the victim sent the defendant yet another text message in which he threatened to jeopardize her employment, warning her: "U hang up on me one more time kiss ur job by . . . ." He reiterated his demand for more money, telling her that he needed $600 by noon that day and that he was tired of letting her think that she could take advantage of him.

During the morning of April 9, 2014, the defendant communicated by text messaging with Jose Cotto. Cotto was her former boyfriend and the father of one of her two children. In a text message that the defendant sent to Cotto at 10:19 a.m., after Cotto discussed his desire to provide for his children, she revealed that she was in a predicament that jeopardized her freedom and her ability to parent her children. She wrote: "I will be dead or in jail soon so my dad will hav[e] them [t]hanks . . . ." Cotto replied, "Why?????," but the defendant did not respond.

In a text message sent by the victim to the defendant at 11:22 a.m. that same day, he questioned whether the defendant had called the police, and she replied that she had not done so. The victim, alluding to his statements to reveal information detrimental to the defendant, asked her "how [it's] gonna be" and stated that he was on his way to his attorney's office. By 1:30 p.m., however, the defendant and the victim had agreed to speak with one another in person later that afternoon.

Before the defendant and the victim saw one another during the afternoon of April 9, 2014, the defendant contacted and visited with Maria Quinonez. Although they had not spoken for many years, the defendant and Quinonez knew one another because the defendant and Quinonez' brother had a daughter together. Quinonez also had known the victim for a long time as well. She was a mother figure in the victim's life and had cared for him when he was younger. The defendant was emotional and frightened when she called Quinonez; she told her that she needed her to intervene on her behalf with the victim because he was threatening her. Quinonez suggested that the defendant should contact the police, but the defendant did not want to do so because she feared that the victim would reveal information to the police that was detrimental to the bail bonds company and in fact could result in the company being "shut down . . . ." At one point during the defendant's conversation with Quinonez, the victim called the defendant's cell phone, and she put the call on speak-

erphone. The victim was unhappy that the defendant had involved Quinonez in their dispute, told the defendant that he wanted her to "get herself checked out," and screamed that he was going to kill her. Before the defendant ended the conversation by slamming the cell phone shut, however, she replied "that she had guns, too . . . ." After she ended her visit with Quinonez, the defendant went to her place of employment for a short period of time, where she obtained her paycheck. Meanwhile, the victim continued to demand that the defendant meet him to give him money.

Several minutes before 4 p.m., the defendant arrived at a bank located at the intersection of Sisson Avenue and Park Street in Hartford. Although the bank was still open when she arrived, the defendant did not transact any business there. Instead, the defendant waited in her automobile in the parking lot of the bank, called the victim, and told him that she was unable to get the money he had demanded from her because the bank was closed. At approximately 4:39 p.m., the victim arrived at the bank in the rented automobile, and the defendant and the victim spoke to one another through the driver's windows of their respective automobiles. Then, the defendant and the victim drove separately to a restaurant that was located nearby on Park Street in Hartford. The defendant left her automobile in the restaurant's parking lot and got into the defendant's automobile.

As he had done throughout the day, the victim expressed his anger that he had contracted a sexually transmitted disease from the defendant. He drove the defendant from the restaurant parking lot to a medical clinic, which was located on Coventry Street in the north end of Hartford, to be tested. At approximately 5 p.m., they arrived at the clinic. The defendant and the victim exited the automobile and walked into the lobby of the clinic. There, the victim spoke with a security guard, who informed him that the clinic was closed for the day. The victim used a restroom at the clinic before he and the defendant left the clinic together.

After the victim left the clinic with the defendant, he drove on the highway for a period of time. He accused the defendant of having sexual relations with her former boyfriend, Cotto. In an attempt to prove the truthfulness of his accusation, he ordered the defendant to use her cell phone to call Cotto and to use the speakerphone function so that he could overhear the conversation. The defendant complied with the request. During the defendant's brief conversation with Cotto, the victim instructed the defendant to ask Cotto if he would have sexual relations with her. After Cotto declined the defendant's offer and questioned why it was being made, the victim ended the call.

By 6 p.m., the victim was driving the rental automobile on Prospect Avenue in West Hartford. As he

approached a fast food restaurant, he stated to the defendant, who was in the front passenger seat, that he was hungry and wanted to get something to eat. He decreased the speed of the automobile and momentarily took his attention away from the defendant. As he did so, the defendant reached for her purse, which was on the floor directly behind the passenger seat. The defendant quickly retrieved a handgun from her open purse and shot the victim in his right temple, incapacitating him immediately. The defendant dropped the handgun and grabbed the steering wheel in an attempt to control the automobile, but it crashed into a fence. Once the automobile came to a stop, the defendant frantically exited the vehicle. She was unable to open the passenger side door but climbed out of the automobile through the rear driver's side door.

The defendant called 911 to report that she had shot someone but ended the call before providing the 911 dispatcher with additional information. The police arrived on the scene soon thereafter. Emergency medical personnel treated the victim at the scene of the shooting and transported him to Saint Francis Hospital and Medical Center. The victim died from the gunshot wound shortly after his arrival at the hospital.

After the defendant was transported to West Hartford police headquarters, she submitted to a lengthy videotaped interview, and, in a written statement, memorialized her version of the events surrounding the victim's death. The defendant admitted that she had shot the victim but claimed that she had done so because he had stated that he was going to drive her to her home in Plainville, kill her family members in her presence, and then kill her. Additional facts will be set forth as necessary.

I

First, the defendant argues that the state failed to disprove beyond a reasonable doubt that she had acted in self-defense. We disagree.

Before we consider whether the state satisfied its burden to disprove beyond a reasonable doubt the defendant's claimed defense, we first must explain the theory of defense that the defendant pursued at trial. See, e.g., *State* v. *Revels*, 313 Conn. 762, 779, 99 A.3d 1130 (2014) (in evaluating whether state has disproven defense beyond reasonable doubt, reviewing court focuses only on theory of defense advanced by defendant during trial), cert. denied, U.S. , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015); *State* v. *Cruz*, 75 Conn. App. 500, 508–12, 816 A.2d 683 (2003) (same), aff'd, 269 Conn. 97, 848 A.2d 445 (2004). The defendant's theory of defense is reflected in her written request to charge, in which she asked the court to instruct the jury that it should consider whether her conduct was justified because she acted in defense of herself.[9]

"Under our Penal Code, self-defense, as defined in [General Statutes] § 53a-19 (a) . . . is a defense, rather than an affirmative defense. See General Statutes § 53a-16. Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12. Consequently, a defendant has no burden of persuasion for a claim of self-defense; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense to the jury. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt. General Statutes § 53a-12 (a) . . . ." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) *State* v. *Clark*, 264 Conn. 723, 730–31, 826 A.2d 128 (2003); see also *State* v. *Reddick*, 174 Conn. App. 536, 552, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied, U.S. , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018).

Section 53a-19 codifies the narrow circumstances in which a person is justified in using deadly physical force on another person in self-defense. Under § 53a-19 (a), "deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." "It is well settled that under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . [Our Supreme Court] repeatedly [has] indicated that the test a jury must apply in analyzing the second requirement . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) *State* v. *Reddick*, supra, 174 Conn. App. 552. Even then, however, "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating . . . or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he or she abstain from performing an act which he or she is not obliged to perform." General Statutes § 53a-19 (b). Moreover, under § 53a-19 (c), "a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor,

except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

To obtain a conviction, the state had to sustain its burden of disproving beyond a reasonable doubt any of the essential elements of self-defense involving the use of deadly physical force[10] or to sustain its burden of proving beyond a reasonable doubt that any of the statutory exceptions to self-defense codified in § 53a-19 (b) and (c) applied.[11] See *State* v. *Singleton*, 292 Conn. 734, 747–48, 974 A.2d 679 (2009); *State* v. *Corchado*, 188 Conn. 653, 663–64, 453 A.2d 427 (1982). "[U]pon a valid claim of self-defense, a defendant is entitled to proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 264 Conn. 731.

"On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . . Moreover, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 778; see also *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). As we have discussed previously in this opinion, the evidence, viewed in the light most favorable to sustaining the jury's verdict, must be sufficient to disprove one or more of the essential elements of the defense or to prove a statutory disability to rely on the defense. See, e.g., *State* v. *Singleton*, supra, 292 Conn. 747–48.

During closing argument, defense counsel discussed in great detail the evidence that he claimed to support the defense. Defense counsel did not dispute that the defendant used deadly physical force by shooting the victim.[12] In focusing on *why* the shooting occurred,

defense counsel argued that the evidence reflected that the defendant had acted under extreme duress after the victim made viable threats that he would kill her and members of her family. Defense counsel argued that, under the circumstances, it was objectively reasonable for the defendant to believe that the killing of her or members of her family "was going to happen . . . . It's imminent . . . ."

The defendant did not testify at trial. In discussing the evidence, defense counsel heavily relied on the videotaped and written statements that the defendant provided to the police in the immediate aftermath of the shooting, as well as the text messages that had been exchanged between the victim and the defendant, several of which we have described previously in this opinion.

In relevant part, the evidence demonstrated that the defendant told the police that, throughout the day on April 9, 2014, the victim became increasingly angry with her. He accused her of being unfaithful, having given him a sexually transmitted disease, and not having provided him with money. The victim demanded money from the defendant, threatened to crash the automobile she had rented for him, and threatened to jeopardize her employment by publicizing sensitive information that she had revealed to the victim about the bail bonds company by which she was employed. Most important to the defense, however, was the fact that the defendant had told the police that, throughout the day, the victim repeatedly threatened to kill not only her, but members of her family.[13]

Defense counsel also highlighted Quinonez' testimony that, on April 9, 2014, the defendant contacted her for advice about dealing with the threats made to the defendant by the victim. In particular, defense counsel highlighted the fact that Quinonez, who had a close bond with the victim, nevertheless testified that she overheard the victim threaten to kill the defendant. Additionally, there was evidence that the defendant told the police that although Quinonez told the victim that he was not going to harm the defendant or her family members, the victim replied to her that he had shot people before and that he had "guns everywhere."

Defense counsel urged the jury to consider the fact that, just prior to the shooting, the victim's threats were being made furiously and that they were "going through [the defendant's] mind." Additionally, defense counsel urged the jury to consider the evidence that the defendant told the police that, while she was a passenger in the victim's automobile on April 9, 2014, he was physically abusive to her.[14] Defense counsel also invited the jury to consider the fact that the defendant, who was a victim of an abusive relationship with her prior boyfriend, Cotto, was aware of the fact that calling the police would offer her little protection because she was

aware that the victim had a close relationship with another bail bondsperson and, following prior arrests, had "bonded out" several times before.[15]

Although defense counsel did not explicitly argue before the jury that the defendant shot the victim during the course of a kidnapping, he drew the jury's attention to the defendant's statements that just prior to the shooting, the victim continued to "driv[e] around" and would not permit her to return to her automobile. The defendant stated to the police that, after she and the victim left the clinic and just prior to the shooting, the victim drove past the restaurant parking lot where her automobile was parked, told her that she would not see her automobile again, and told her that he was on his way to her home, which was in Plainville. Specifically, the defendant told the police the following about what occurred after she and the victim left the clinic: "[W]e went back to [my] car, and I said, listen, tomorrow when I cash my check, I'll give you the whole thing. I don't care about the money. Just drop me off and let me live my life. I'm not going to call the police on you. I'm not going to do nothing. Just let me go and just move on if you don't believe me, then fine. We don't have to be together. I won't . . . call the police. I won't press charges. Just let me go.

"And [the victim] was, like, no, not until I'm finished with you. I'm not finished yet. We didn't talk in front of your kids yet. We haven't talked to your father yet. We haven't talked to anybody yet. . . . I'm going to drive you by your car. So we drove by the [restaurant on Park Street] and he's, like, you see your car? That's the last time you're ever going to see your car." Also, the defendant told the police that, as the victim drove past the restaurant on Park Street where her automobile was parked, he told her, "Now we're going to your house."

The defendant explained the circumstances and her mindset at the moment that the shooting occurred. She told the police that, just after the victim drove her past the restaurant parking lot on Park Street where her automobile was parked, he approached the fast food restaurant on Prospect Avenue, near where the shooting occurred.[16] She stated: "And he was looking at [the fast food restaurant], and he said I'm so hungry, I want to get something to eat. And I said . . . to myself, this is my only chance because he's not looking at me. Because he was going, he said, to get on the highway to go to my house, over there. We're going to your house now. We're going to see what your dad and your kids think about you giving me an STD [sexually transmitted disease]. . . . So I [reached for my purse]. He goes what the fuck are you doing? And I pulled it out and I . . . shot him."

The defendant stated: "He was looking at [the fast food restaurant] . . . talking about what he was going

to eat and so I thought I could . . . I was like this is my only chance because he's been on top of me since I been in the car. . . . I was, like, let me get out, let me get out, let me get out. . . .

"He said go ahead and jump. He said we're going to go home and see your kids."

When asked by the police what her thought process was when she grabbed her purse, the defendant replied: "That he's going to take me to my house and kill everybody there and then kill me. . . .

"[O]nce I got the purse, once I said to myself, you need to get the purse, you need to get your gun, like, this dude is about to bring you back on the highway to your kids and he says he's going to kill everybody. I saw him with a gun before. I saw it in his pants. It was either a gun or it was something else. . . . I saw it there. Not today but another day. . . .

"I don't know if there was [a gun belonging to the victim] in the car or what he was planning on, like, shooting us all with, maybe my gun. I don't know." In her written statement to the police, the defendant stated in relevant part: "I pleaded and begged him for my life and the lives of my family. I offered to do whatever he wanted and give him however much money he wanted. That wasn't enough he wanted us dead. I did what I did because I believed he was going to kill us when we got to my house."

Having discussed the evidence supporting the defense, defense counsel urged the jury to find that the defendant was "100 percent credible on everything" and that the state had not presented any evidence that undermined her belief that she acted reasonably by shooting the victim.[17] Defense counsel argued that, in light of the viable threats made by the victim and his violent conduct prior to the shooting, the defendant did not have "any other alternative at that point in time."[18]

During closing argument, the prosecutor directly challenged the defendant's reliance on the defense of self-defense. Referring to the evidence, particularly the text messages exchanged between the defendant and the victim, the prosecutor argued that it was clear that the victim had been blackmailing the defendant and that the defendant, believing her employment and financial well-being were in serious jeopardy, retaliated by shooting him. The prosecutor argued that the evidence demonstrated that, after the defendant disclosed to the victim highly detrimental information about the bail bonds company early in their relationship, he successfully pressured her to rent automobiles for him and to provide him with $1000. The prosecutor argued that on the day of the shooting, the victim continued his blackmailing scheme by demanding even more money from the defendant, who, as she stated in her text messages, could not afford to continue supporting him to

keep him silent. Thus, the prosecutor argued that the evidence did not demonstrate that the defendant had acted on a reasonable belief that the victim was about to use deadly physical force against her.

Additionally, the prosecutor argued that, even if the defendant reasonably believed that the victim was about to use deadly physical force against her, the evidence demonstrated that the defendant did not reasonably believe that deadly physical force was necessary to repel an attack. In this vein, the prosecutor referred to evidence that she claimed to reflect that there were numerous opportunities for the defendant to summon assistance or otherwise extricate herself from the victim's control on April 9, 2014. The prosecutor also argued that the use of deadly physical force was unreasonable because, when the defendant shot the victim, there was no indication that the victim was in possession of a gun or that his use of force against her was imminent. The prosecutor argued in relevant part: "No reasonable person could believe that deadly physical force was being used against her at that time. Nor could they believe deadly physical force was necessary to repel the attack. There simply was no attack at that moment in time." The prosecutor argued that, to the extent that the defendant attempted to prove that the victim was on his way to kill her and her family members at her home in Plainville, as he had threatened, the possibility that the victim would harm the defendant at a future time did not warrant her use of deadly physical force in front of the fast food restaurant in West Hartford.[19]

In her appellate brief, the defendant argues primarily that the state did not present any evidence that contradicted her version of events. Moreover, the defendant relies on the fact that many of the facts reflected in her statements to the police were corroborated by other evidence.

Before this court, the defendant also argues: "Since only [the victim] and the defendant were present in the vehicle at the time of the shooting, the defendant's statements provided the only foundational evidence as to what led up to the shooting. The state presented no evidence that at the time the defendant fired the shot she did not believe that [the victim] was using or about to use deadly physical force against her or that the force used was necessary to defend herself. . . . The police verified and corroborated all the aspects of her account of events, and nothing she relayed had been found untrue. There is no doubt that the defendant actually and sincerely believed that there was an ongoing threat that [the victim] was about to use deadly physical force against her and her family." (Citation omitted.) The defendant argues that "[t]he jury had to resort to speculation and conjecture to conclude that she did not reasonably believe that her life was at risk

or that it was not necessary for her to use deadly force in response to the situation.

"From the defendant's videotaped and written statement, there is no doubt that at the time that she fired the shot she actually believed that [the victim's] use of force against her was escalating and that he was about to use deadly physical force against her. The state did not present any evidence otherwise. Viewing the circumstances from the defendant's perspective under the circumstances, a reasonable person would have shared her belief. . . . The defendant was credible in her explanation that she believed [that] when she shot the [victim] it was her only chance to stop him from killing her and her family, and that she honestly and sincerely believed that was the degree of force necessary."

The defendant further argues: "Since the only evidence presented as to what was going on in the vehicle prior to the shooting was the defendant's testimony, if the jury disbelieved her testimony regarding [the victim's] use and threats of force, it was not free to infer that the state's arguments that the decedent was not using or was not about to use deadly physical force was true." According to the defendant, "[a]t the moment she shot the [victim] she reasonably believed that was her only chance to stop him from killing her and her children. The fact that she was a passenger in a moving vehicle when she shot the [victim] reveals that her actions were borne out of absolute necessity."

The defendant suggests in her arguments that the state bore the burden of producing evidence that disproved her defense and that, because it failed to do so, the jury was bound to accept as credible the facts she provided in her statements to the police. As we explained previously in this opinion, however, after the defendant satisfied her burden of production, that is, presenting evidence in support of the defense on which she explicitly relied at trial, the state did not bear a burden of *production* with respect to disproving the defense, but a burden of *persuading* the jury beyond a reasonable doubt that the defendant did not act in self-defense. See *State* v. *Clark*, supra, 264 Conn. 730–31 (discussing state's burden of persuasion for a claim of self-defense). It suffices to observe that the jury is not required to accept as credible the defendant's version of events and that the state may satisfy its burden of persuasion by convincing the jury that the evidence on which the defense relies is not credible.

This principle is reflected in relevant precedent. For example, in *State* v. *Gooch*, 186 Conn. 17, 26, 438 A.2d 867 (1982), our Supreme Court observed that a claim of self-defense "depends in the first instance on the credibility of the defendant and of his witnesses." In *Gooch*, the Supreme Court concluded that the jury's guilty verdict reflected a finding by the jury that there was no factual basis for the defense of self-defense. Id.

In *State* v. *Boone*, 15 Conn. App. 34, 48, 544 A.2d 217, cert. denied, 209 Conn. 811, 550 A.2d 1084 (1988), this court, following *Gooch*, likewise reasoned that the defenses advanced by the defendant depended on the credibility of the defendant and his witnesses, and that the jury's verdict of guilty reflected that the jury had found that no factual basis existed for the defenses. Similarly, in *State* v. *Pauling*, 102 Conn. App. 556, 572, 925 A.2d 1200, cert. denied, 284 Conn. 924, 933 A.2d 727 (2007), this court rejected a claim that the state had failed to disprove the defense of self-defense. In relevant part, this court reasoned: "The jury was free to disbelieve the defendant's version of the events that resulted in the injuries to [the victim]. On the basis of the evidence and the reasonable inferences drawn from it, we conclude that the state presented sufficient evidence during the course of the trial to disprove the defendant's claim of self-defense beyond a reasonable doubt." Id.

Having reviewed the evidence in its entirety, we conclude that there was a rational view of the evidence that supported a finding that the defendant did not subjectively believe either that the victim was about to use deadly physical force against her or that her use of deadly physical force was necessary to protect her physical well-being. The evidence reflects that in the weeks prior to the shooting, the defendant, who lacked the means to continue to support both her family and the victim financially, provided the victim with rented automobiles and $1000. As the defendant acknowledged in her statement and as is reflected in the text messages exchanged between the victim and the defendant on the day of the shooting, the victim angrily and repeatedly demanded even more money from the defendant. The defendant argues before this court that the evidence demonstrated that the victim threatened to harm her and her family if she failed to pay him. The evidence, however, directly reflected that the victim threatened to reveal information about the bail bonds company for which she worked if she failed to pay him. There was evidence that, soon after their relationship began, the victim learned such information from the defendant and that he quickly used it to his advantage. He drew an analogy between his ability to extract money from the defendant and playing a game.[20]

Moreover, a rational view of the evidence, particularly the extensive text messages that were exchanged between the defendant and the victim in the hours prior to the shooting,[21] reflects that the defendant understood what the victim was referring to when he told her that he would reveal information about the company for which she worked, she labeled the victim a "snitch" who had betrayed her trust, and she expressed deep concern about her ability to continue to care for herself and her children financially in light of the victim's threats. The evidence also showed that, in the hours

before the shooting, the defendant recognized the seriousness of the victim's threats to reveal information about the bail bonds company for which she worked. She told her former boyfriend that she would either be "dead or in jail soon" and made it clear to the victim that if he took away her "way to work," she would have nothing to live for. Expressing further thoughts about her own mortality shortly before the defendant used deadly physical force against the victim, she also stated to the victim that her children would be able to collect extra life insurance money if she died "a tragic death . . . ." As the prosecutor vehemently argued before the jury, in light of this evidence of blackmail and its toll on the defendant, it was reasonable for the jury to find that the defendant did not shoot the victim in self-defense, but that she did so to prevent him from continuing to blackmail her or harming something that she valued, namely, her continued employment at the bail bonds company.[22]

This view of the evidence is supported by several undisputed facts, including that, despite the victim's repeated threats earlier that day, the defendant voluntarily got into the victim's automobile prior to the shooting, she failed to use her cell phone to summon assistance during the lengthy period of time in which she was with the victim prior to the shooting, and she utilized deadly physical force when the victim was near a fast food restaurant in West Hartford. According to the defendant, she shot the victim just after he stated that he thought he would "get something to eat" and began to drive slowly toward the fast food restaurant on Prospect Avenue. The defendant stated that, at that time, she "thought he might go into [the restaurant]."

We also address the weight of the defendant's argument that "[t]he police verified and corroborated all the aspects of her account of events and nothing she relayed had been found untrue." We observe that the state presented evidence that tended to undermine some aspects of the defendant's version of events. For example, the defendant stated to the police that, during her meeting with Quinonez on the day of the shooting, Quinonez advised her to call the police and that she came to believe that it was the "only thing [she] can do." Quinonez testified, however, that after she advised the defendant to contact the police, the defendant stated that she did not want to do so because, if the victim was questioned by the police, "it could shut down her [bonds] company."

Moreover, the defendant told the police that, after the victim demanded money from her on the day of the shooting, she picked up her paycheck and went to the bank. She stated that the bank closed three minutes before she arrived and that she was unable to cash her paycheck at that time. She stated that she arrived at 4:04 p.m. The state, however, presented video surveillance

evidence from the bank that reflected that the defendant arrived at the bank at 3:56 p.m., four minutes prior to the time at which the bank lobby was closed for the day, but she did not attempt to transact any business at the bank immediately after her arrival.

Additionally, the defendant told the police that when she "first got in" the victim's automobile on the day of the shooting, he took possession of her purse and put it on the floor in the rear of the automobile because he was aware of the fact that she kept a handgun in her purse. She stated that, as he did that, he said, "just so you don't try no funny shit." The state, however, presented video surveillance evidence taken from the clinic that the defendant and the victim went to prior to the shooting. The video plainly shows that the defendant and the victim entered the clinic together and that the defendant carried her purse with her, on her shoulder, as she entered, remained in, and departed the clinic with the victim.[23]

Even if we were to assume that the state failed to persuade the jury beyond a reasonable doubt that the evidence did not support a finding that the defendant subjectively believed that an attack on her by the victim was imminent, or that the evidence did not support a finding that she subjectively believed that her use of deadly physical force was necessary to defend herself, we nonetheless conclude that the state persuaded the jury beyond a reasonable doubt that the evidence did not support a finding that she acted in self-defense because her subjective belief that an attack was imminent was not objectively reasonable. Before this court, the defendant argues that "imminent" does not necessarily mean "immediate." She argues: "In order to satisfy [§ 53a-19], the deadly physical force did not have to be actually . . . used against the defendant at the exact moment of the shooting. . . . The use of the word 'imminent' in self-defense statutes reflect[s] that the requirements of the timing of the use of force are not as stringent as if the use of force was 'immediate.' . . . The proper inquiry is not the immediacy of the threat but the immediacy of the response necessary in defense. If a threatened harm is such that it cannot be avoided if the intended victim waits until the last moment, the principle of self-defense must permit him to act earlier—as early as is required to defend himself effectively. . . . That was the situation in the present case, the defendant had to react to the threat that was imminent or actually about to happen, the [victim's] words and actions were hanging threateningly over her head. Her actions were necessary to thwart his plan to kill her and her family when they reached her home. If the defendant did not seize the opportunity to grab her pocketbook that contained her gun, she risked not having another opportunity to defend herself." (Citations omitted.)

The problem with the defendant's analysis of the present claim is that it is premised on a definition of "imminent" that she did not advance in her written request to charge and that was not provided to the jury. In her written request to charge, the defendant asked the court to instruct the jury in relevant part: "[Section 53a-19] requires that, before a defendant uses physical force upon another person to defend herself, she must have two reasonable beliefs: (1) A reasonable belief that physical force is then being used or about to be used upon her, and (2) a reasonable belief that the degree of force she is using to defend herself is necessary for that purpose. . . . *The word 'imminent' means that the person is about to use physical force at that time. It does not encompass the possibility that an act of physical force may take place at some unspecified future time.*" (Emphasis added.) The parties agreed that the defendant used deadly physical force and, multiple times in her written request to charge, the defendant framed the proper inquiry concerning the imminency requirement in § 53a-19 to be simply whether the victim was "using or about to use" deadly physical force against her at the time of the shooting.[24]

Consistent with the defendant's written request to charge, the court provided the jury with lengthy instructions concerning self-defense. In discussing the state's burden of proof with respect to self-defense, the court instructed the jury in relevant part: "The evidence in this case raises an issue of self-defense, and that applies to both charges. After you have considered all of the evidence in the case, if you find that the state has proved beyond a reasonable doubt each element of each crime charged you must then go on to consider whether or not the defendant acted in self-defense. A person is justified in the use of force against another person that would otherwise be illegal if she is acting in the defense of self. It is a complete defense to certain charges, including murder and manslaughter.

"When, as in this case, evidence of self-defense is introduced at trial, the state must not only prove beyond a reasonable doubt all of the elements of the crimes charged to obtain a conviction, but must also disprove beyond a reasonable doubt that the defendant acted in self-defense. If the state fails to disprove beyond a reasonable doubt that the defendant acted in self-defense, you must find the defendant not guilty, despite the fact that you have found the elements of the crimes proved beyond a reasonable doubt. The defendant has no burden whatsoever with respect to the defense."

In its detailed instructions concerning the elements of self-defense, the court instructed the jury in relevant part that "[a] person is justified in using reasonable physical force upon another person to defend herself from what she reasonably believes to be the use or

imminent use of physical force. And she may use such degree of force, which she reasonably believes to be necessary for that purpose." Later, in discussing the elements of self-defense in greater detail, the court once again instructed the jury with respect to the imminency requirement of self-defense, stating: "[T]he defense of self-defense has four elements. One, the defendant actually believed that someone [was] using or about to use physical force against her. If you have found that the force used by the defendant was deadly physical force, then the element requires that the defendant actually believed that the other person . . . was using or about to use deadly physical force against her, or was inflicting or about to inflict great bodily harm upon her." The court went on to instruct the jury in relevant part: "The first element is that when the defendant used defensive force against [the victim], she honestly and sincerely believed that he was using or about to use physical force against her. The word using has its ordinary meaning, that is, the other person has already begun to use force. *The word imminent means that the person is about to use physical force at that time. It does not encompass the possibility that an act of physical force may take place at some unspecified future time.*" (Emphasis added.)

Before concluding its detailed instructions with respect to self-defense, the court reiterated that the state, not the defendant, bore the burden of proof with respect to self-defense. The court stated in relevant part: "Remember that the defendant has no burden of proof whatsoever . . . with respect to the defense of self-defense. Instead, it is the state's burden to prove beyond a reasonable doubt that the defendant did not act in self-defense if it is to prevail on the charges of murder and manslaughter. To meet this burden, the state need not disprove all four of the elements of self-defense. Instead, the state can defeat the defense of self-defense by disproving any one of four elements of self-defense beyond a reasonable doubt to your unanimous satisfaction." The defendant did not take an exception to the court's instruction.[25]

We must presume that the jury carefully followed the court's instructions, rather than any contrary principles of law on which defense counsel relied during closing argument. "In the absence of any indication to the contrary, we presume that the jury followed the court's instruction." *State* v. *Reynolds*, 264 Conn. 1, 141, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). We reiterate that the court's self-defense instruction, which is not challenged on appeal, was consistent with the self-defense instruction requested by the defendant at trial.[26]

Our legislature did not provide a definition for the word "imminent" as it is used in § 53a-19. "It is well established that, when determining the meaning of a

word, it is appropriate to look to the common understanding of the term as expressed in a dictionary. . . . This precept . . . pertains primarily to the situation where no statutory definition is available." (Citation omitted; internal quotation marks omitted.) *State* v. *Spillane*, 255 Conn. 746, 755, 770 A.2d 898 (2001); see also *State* v. *Panek*, 328 Conn. 219, 237, 177 A.3d 1113 (2018) (same). "Imminent" is defined as "likely to occur *at any moment*; impending." (Emphasis added.) Random House Webster's Unabridged Dictionary (2d Ed. 2001).

Consistent with this definition, which describes an occurrence that is almost immediately at hand, our case law reflects that "[t]he defense of self-defense does not encompass a preemptive strike." *State* v. *Lewis*, 220 Conn. 602, 620, 600 A.2d 1330 (1991); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 676, 751 A.2d 398 (same), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000). "The actor should not be permitted to use force when such force would be equally as effective at a later time and the actor suffers no harm or risk by waiting." (Internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 833, 60 A.3d 246 (2013); *State* v. *Hall-Davis*, 177 Conn. App. 211, 225–26, 172 A.3d 222, cert. denied, 327 Conn. 987, 175 A.3d 43 (2017). As this court has observed, self-defense depends on a showing that an aggressor is using or about to use physical force. See *State* v. *Peters*, 40 Conn. App. 805, 814–15, 673 A.2d 1158 ("the defendant must entertain an honest belief that the other person is using or is about to use physical force, and the defendant's decision to use defensive force must be based on this sincere belief as opposed to anger, malice or revenge"), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996).

In this appeal, the defendant does not claim that the court did not accurately instruct the jury with respect to the imminency requirement of § 53a-19, and, as the authorities cited previously reflect, the court's instruction was consistent with the instruction requested by the defendant at trial, the plain language of the statute, and our case law interpreting the statute. Applying the law as provided to it by the court, the jury reasonably could have found that, at the time of the shooting, the victim was neither using nor about to use deadly physical force against the defendant. There was no evidence, and the defendant does not argue, that the victim was using deadly physical force against her when she shot him in the head. Rather, in her statement to the police, the defendant explained that she shot the victim as he approached a fast food restaurant and indicated that he wanted to purchase something to eat. The shooting occurred in West Hartford, not in close proximity to the defendant's residence in Plainville. The defendant acknowledged that she did not know if the victim was in possession of a gun that day. Thus, even if the jury relied on the defendant's version of the facts, it was

reasonable for the jury to have concluded that, at the time of the shooting, the victim's threat to shoot the defendant and members of her family reflected his intent to use deadly physical force at a future time. Despite the defendant's belief that the moment at which she shot the victim was her last chance to stop the victim from harming her in the future, the evidence supported a finding that the defendant's use of deadly physical force was premature. Accordingly, we conclude that the state satisfied its burden of disproving that, at the time of the shooting, the victim's use of deadly physical force was imminent.

In light of the foregoing, we conclude that the state demonstrated beyond a reasonable doubt that the defendant did not use deadly physical force in self-defense.

II

Next, the defendant claims that the court violated her right to due process and her right to the effective assistance of counsel by denying the jury's request to rehear the closing arguments of the prosecutor and defense counsel at trial. We disagree.

The following additional facts are relevant to the present claim. Jury deliberations occurred over the course of three days. During its deliberations, the jury asked to rehear the testimony of several witnesses, to further examine some of the videotaped materials shown to it during the trial, and for additional instruction with respect to some of the legal principles that applied. The court responded to these inquiries, which are not relevant to the present claim. At issue in the present claim is the manner in which the court responded to a note that the jury sent to the court on the third and final day of its deliberations. The note stated: "Can we re-listen to both closing arguments again, please?"

Outside of the jury's presence, the following colloquy between the court and counsel occurred:

"The Court: . . . There is a note from the jurors. It reads as follows: Can we re-listen to both closing arguments again, please?

"And obviously the answer is no, but my intention was to read to them the section from the instruction on direct and circumstantial evidence, which tells them . . . the evidence from which you're to make the decision, and the first paragraph in terms of what is not evidence. So, let me know if there [are] any problems with that.

"[The Prosecutor]: No, Your Honor.

"[Defense Counsel]: I don't think so, no.

"The Court: Okay."

Thereafter, the jury returned to the courtroom and,

in relevant part, the court replied to the jury's written request as follows: "And the answer is no. And I'm going to go over with you the instruction so that you understand why.

"The evidence from which you are to decide what the facts are consists of one, the sworn testimony of witnesses both on direct and cross-examination, the exhibits that have been admitted into evidence, and any stipulations of the parties. . . .

"In reaching your verdict, you should consider all the testimony and exhibits admitted into evidence. Certain things, however, are not evidence, and you may not consider them in deciding what the facts are.

"These include arguments and statements by the lawyers. The lawyers are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence.

"If the facts as you remember them differ from the way the lawyers stated them, your memory of the facts controls. It is not proper for the attorneys to express their opinions on the ultimate issues in the case or to appeal to your emotions.

"And what else is also not evidence is the document called the information, which you do have with you. The information is merely the formal manner of accusing the person.

"And so, as I indicated, the answer is no, and I just read you why you wouldn't be able to hear it. So, with that, you can resume deliberation."

Thereafter, the jury resumed its deliberations. Neither the prosecutor nor defense counsel addressed the issue again, and the jury did not communicate further with the court with respect to its request to rehear closing arguments. Later that day, the jury returned its verdict.

Before this court, the defendant argues that the trial court's response to the jury's request violated her right to due process and her right to the effective assistance of counsel as guaranteed under the state and federal constitutions.[27] The defendant acknowledges that defense counsel did not object to the court's response to the jury's inquiry but argues that the claim is reviewable pursuant to the bypass doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[28]

The state argues, and we agree, that the defendant is unable to prevail under *Golding* because defense counsel waived any objection to the manner in which the court responded to the jury's request.

"[W]aiver is [t]he voluntary relinquishment or abandonment—express or implied—of a legal right or

notice. . . . In determining waiver, the conduct of the parties is of great importance. . . . [W]aiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal. . . . Thus, [w]aiver . . . involves the idea of assent, and assent is an act of understanding." (Internal quotation marks omitted.) *State* v. *Cancel*, 149 Conn. App. 86, 100, 87 A.3d 618, cert. denied, 311 Conn. 954, 97 A.3d 985 (2014). "The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy. . . . Connecticut courts have consistently held that when a party fails to raise in the trial court the constitutional claim presented on appeal and affirmatively acquiesces to the trial court's order, that party waives any such claim." (Internal quotation marks omitted.) *State* v. *Velez*, 113 Conn. App. 347, 357–58, 966 A.2d 743, cert. denied, 291 Conn. 917, 970 A.2d 729 (2009).

"Both our Supreme Court and this court have stated the principle that, when a party abandons a claim or argument before the trial court, that party waives the right to appellate review of such claim because a contrary conclusion would result in an ambush of the trial court . . . ." (Internal quotation marks omitted.) *State* v. *Reddick*, 153 Conn. App. 69, 85, 100 A.3d 439, cert. denied, 315 Conn. 904, 104 A.3d 757 (2014). This principle applies to review pursuant to *Golding*. "[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . ." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 448–49, 988 A.2d 167 (2009); see also *State* v. *Frazier*, 181 Conn. App. 1, 36, 185 A.3d 621 (valid waiver thwarts relief under third prong of *Golding*), cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

As the colloquy between the court and counsel, which was set forth previously in this opinion, reflects, after the court received the jury's request, it told counsel how it intended to respond to the inquiry. The court then invited feedback from counsel by expressly asking whether there were "any problems" with its proposed response. Both the prosecutor and defense counsel affirmatively replied that there were no objections to the court's response and, even after the court addressed the jury in the manner it had proposed, neither the prosecutor nor defense counsel stated any reservations or objections to the court's response.[29] The court directly asked counsel to weigh in with respect to the request made by the jury and its proposed response,

thereby serving the important function of alerting the trial court to any error while there was still an opportunity to correct it in the absence of a new trial, and defense counsel unambiguously led the court to the conclusion that he accepted the court's proposal as appropriate. Beyond merely failing to object to the court's proposed response, defense counsel affirmatively stated that he did not object to it. Permitting the defendant now to object to the court's response, after defense counsel acquiesced in it at the time of trial, would constitute an ambuscade of the trial court. See, e.g., *State* v. *Rosado*, 147 Conn. App. 688, 698–704, 83 A.3d 351 (2014) (defense counsel's acquiescence in court's decision not to respond to note from jury prior to accepting jury's verdict constitutes waiver and precludes relief under *Golding*), cert. denied, 311 Conn. 928, 86 A.3d 1058 (2014), overruled in part on other grounds by *State* v. *McClain*, 324 Conn. 802, 815 n.10, 155 A.3d 209 (2017).[30] Accordingly, we conclude that the defendant, having waived the claim of error, is unable to prevail under *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court imposed a sentence of twenty-five years of incarceration, which included a five year mandatory minimum sentence. The jury found the defendant not guilty of murder in violation of General Statutes § 53a-54a.

[2] The rental agreement was executed by the defendant and, pursuant to the rental car company's policies, the victim, who was neither her spouse nor resided with her, was not an authorized driver.

[3] After the victim threatened to crash the rental automobile, the defendant wrote: "Get ready 4 the saints gon visit u tnt lol u doNt [k]now me."

[4] In a text message, the victim stated: "Lol if ne cop comes my way or call my phone, don't for get we know where u rest ur head so don't do it to urself bby cause I'll make u lose ur job I have so much against u and that company that it not even funny . . . ."

[5] In text messages, the victim stated: "U did this bby u think u can cheat and me not find lmfao . . . bitches like u just get use and abuse . . . I have pictures of u. I'll exposes u like crazy . . . try me U messing with the wrong one, but remember I know all the dirt u and the company doing u put me on to the wrong shit lmfao . . . ."

[6] In a text message, the defendant stated: "Let me live and ill fall so far back . . . but if u take away my way 2 work ill have nothing 2 live 4 my kids get xtra lifE ins money if its a tragic death . . . ."

[7] In a text message, the victim stated: "I need 600 to get on [my] feet u got me or should I just call my attorney and get this in process cause honesty u know they [dying] to shut [the bail bonds company] down . . . or should I say shut Angela down lmfao . . . . U wanna leave me out here fucked up and broke . . . ."

[8] Rather than question why the defendant would call him a "snitch," the victim appeared to be amused with the label. He replied to the defendant via text message: "Lol snitch huh lmfao another one to add to my fame base . . . ."

[9] In her appellate brief, the defendant inaccurately states that she "requested and the court found the evidence sufficient to charge the jury on self-defense *or defense of others*." (Emphasis added.) Our scrupulous examination of the request to charge reflects that the defendant requested an instruction on self-defense, not an instruction on defense of others. Consistent with the defendant's request to charge, the court did not provide the jury with an instruction on defense of others.

[10] At trial, counsel stipulated that this case involved the use of deadly force.

[11] The facts of the present case do not implicate any of the exceptions set forth in § 53a-19 (c).

[12] See footnote 10 of this opinion.

[13] There was evidence that the defendant told the police that, when she

talked to the victim on the telephone early in the morning on April 9, 2014, he accused her of being with someone else and said, "I'm going to fucking kill you and him if I ever find out who it is . . . ." There was evidence that, in a text message that the victim sent to the defendant at 9:07 a.m., on April 9, 2014, he alluded to the fact that he or someone else could cause her physical harm. He warned her not to call the police and stated in relevant part, "don't for get we know where u rest ur head so don't do it to urself . . . ."

Additionally, the defendant stated to the police that, later that morning, when the victim was on speakerphone talking to her and Quinonez, he stated that he was going to kill her children and her father. She stated that, after Quinonez told him to stop making threats, the victim replied, "don't worry, I've got something for her. . . . He was, like, you know how we dwell here in these streets, I shot people before. It's nothing new. We got guns everywhere. Everywhere I want to go, I have a gun. . . . You're not going to find me. You're not going to know it's me."

The defendant stated that before she went to the bank, she spoke with the victim on the telephone and he said, "you either come meet me right now and bring me some money or I am going to shoot you, your kids, and your father in the face while you watch and you're going to be last and you better go to the bank before you come."

The defendant also recounted to the police statements that the victim allegedly made to her while he was driving her to the clinic. She stated: "[I]f I gave him an STD [sexually transmitted disease], he's going to kill me for real and . . . he just started saying . . . how he was going to kill me and it . . . had to do with my private parts because I would burn him." In her videotaped statement to the police, the defendant stated that the victim told her that, if she was "dirty," he would kill her "from [her] inside out" and that he was going to kill her whole family by shooting them "in their faces while [she] watched." Similarly, in her written statement to the police, the defendant stated that the victim allegedly linked his threats to his belief that he had contracted a sexually transmitted disease from the defendant. She stated in relevant part: "He said that if I 'burned him' he would shoot my vagina and watch me bleed out after he killed my kids and my father in front of me. He pulled my hair [and] spit on me and said how I was going to watch as my kids died and then I would watch as I bled out from my 'dirty pussy.' " In her written statement, the defendant also stated that the victim told her that "all you bitches . . . deserve to be 'under the dirt,' " her children "would be better off dead than with a mother like [her]," and he "should kill [her]" to prevent her from spreading sexually transmitted diseases to other people.

[14] The defendant stated that, when she and the victim arrived at the clinic, he warned her, "don't run, or I'm going to get to your house before you can." The defendant told the police that, after she left the clinic with the victim and he was driving, he grabbed her by the hair and pulled her face down to where the gear shift was located. On one occasion, the defendant stated, "he put my face down . . . on his penis and was, like . . . [y]ou gave me an STD [sexually transmitted disease] and you're going to pay . . . ."

[15] Additionally, the defendant stated that earlier in the day, she thought about contacting the police but did not do so because the victim told her that doing so would be futile. She stated: "[H]e already told me . . . I've got a bondsman under my finger. . . . [Y]ou can call the cops on me. You can put me in jail. All these other girls have called the cops on me and, guess what, I bond right back out and I'll be at your door the next day. And I know that's true because when my ex did this, he bonded right out. . . . I know how bonds work. You don't stay in jail for more than a couple of hours if you have a good bondsman. . . . You don't. You come right back out."

The state presented testimony from Norman Landry, a bail bondsman who had posted at least three bonds for the victim prior to the events at issue in this case. Landry testified that, on April 9, 2014, he spoke with the victim several times throughout the day, and that the victim told him that he "had a situation" with the defendant in that he had been " 'burned by her' as far as an STD [sexually transmitted disease] was concerned." Additionally, Landry testified that the victim told him that "he had information about [the bail bonds company] as far as taking them down."

[16] The state presented evidence that the restaurant parking lot on Park Street was located approximately one block away from the fast food restaurant on Prospect Avenue. At trial, one West Hartford police officer described the two locations as being "just around the corner" from one another.

Additionally, we observe that, in her videotaped statement to the police, the defendant expressed her belief that at the time she shot the victim in front of the fast food restaurant, he was driving in the direction of a nearby highway and was planning on going to her residence. She stated that the victim looked at the fast food restaurant, "[s]aying he wanted to get something to eat . . . [a]nd that he was going to get on the highway *right there*." (Emphasis added.) Additionally, the defendant expressed her belief that, after the victim passed the restaurant parking lot on Park Street, where her automobile was parked, she thought, "[w]e were going on the highway," because the victim told her that they were going to her residence in Plainville.

[17] In her appellate brief, the defendant accurately observes that the police corroborated several of the facts reflected in her statements. Thus, apart from her statements, there was evidence of the following facts: she rented two automobiles at the times and manner she described; her cell phone had been found along Interstate 84 in the Hartford area; she met with Quinonez on April 9, 2014; she was present in the bank parking lot on the afternoon of April 9, 2014; she and the victim were present at the clinic on the afternoon of April 9, 2014; on the day prior to the shooting, she spoke by telephone with her former boyfriend, Cotto, and told him that the victim was threatening her; on the afternoon of April 9, 2014, she spoke by telephone with Cotto and asked him if he would have sexual relations with her; after the shooting, police found her automobile in the parking lot of the restaurant on Park Street; and, on April 9, 2014, she did not have sufficient funds in her bank account to pay the victim the money that he requested of her that day.

[18] Defense counsel argued: "You judge whether or not she was facing a situation that was going to lead to imminent death, imminent—about to happen. Imminent is a word that's usually used with something bad about to happen, foreshadowing."

[19] Stressing the absence of evidence of an imminent use of force by the victim, the prosecutor argued in relevant part: "And what about the threats to kill her and the kids when they got to [the defendant's residence in] Plainville. Well, Plainville's [fifteen to twenty] minutes away from where they were. Who knows whether he would've even gone there? Who knows whether it would've happened? It's completely speculative to suggest that she had to kill him right then and there at that exact moment."

[20] In one of the text messages that the victim sent to the defendant on April 9, 2014, after the defendant referred to the $1500 she had spent on him, he stated: "[Rem]ember [two] could play the game only one can play it better . . . I believe I always told u that right . . . ."

[21] Previously in this opinion, we discussed and set forth the substance of many of the text messages relevant to our analysis.

[22] Moreover, even if the jury found the defendant's statements that she feared that the victim was going to harm her and her family in the future to be credible, it would have been reasonable for the jury to find that her concern for her employment outweighed these other concerns and was the primary factor in her decision to utilize deadly physical force.

[23] The video surveillance evidence, as well as the testimony from the security guard stationed at the front desk of the clinic on the day of the shooting, reflected that, although the defendant had an opportunity to speak to the security guard outside of the victim's presence, she did not do so.

[24] During closing argument, defense counsel discussed imminency in somewhat broader terms, likening it to "foreshadowing," but he did not devote a great deal of his argument to this issue. He emphasized the defendant's statements that the victim had threatened to kill her and her family members when he arrived at her residence in Plainville. Defense counsel stated: "You judge whether or not she was facing a situation that was going to lead to imminent death, imminent—about to happen. Imminent is a word that's usually used with something bad about to happen, foreshadowing." Later, defense counsel argued: "And it wasn't that long, it wasn't that long, ladies and gentlemen, from where this happened to where she lives in Plainville. So, it was going to happen. It's imminent, and if you believe what she believed, then she did what she had to do and it's reasonable."

[25] During its deliberations, the jury asked the court to provide clarity with respect to its use of the word "imminent." In response, the court reiterated the self-defense instruction that it provided during its charge. Defense counsel did not object to the manner in which the court responded to the jury's inquiry.

[26] The defendant stated to the police that she shot the victim after he drove past her automobile, which was parked in the parking lot of a restaurant on Park Street, and made it clear to her that she was not free to leave his

presence. Additionally, the victim stated that she considered shooting the victim as her "only option" to prevent him from killing her and members of her family. The victim stated: "There was no other way out of it. Even if I jumped out of the car . . . I would have either died right there or he would have gotten to my house first and killed everybody."

We observe that the defendant relied on the precise language of § 53a-19, which applies in circumstances in which the use or imminent use of force is shown. She did not rely on any common-law defenses that, although not *expressly* sanctioned by statute, may have applied. Our courts have recognized that statutes that enumerate the instances in which the use of force is justified generally should be interpreted to encompass any defenses related to the use of force that are available at common law. See, e.g., *State* v. *Havican*, 213 Conn. 593, 598–99, 569 A.2d 1089 (1990) (interpreting § 53a-19 to incorporate common-law rule that persons may justifiably use deadly force in self-defense against sodomy and rape). Thus, the defendant did not advance a theory of defense that might have been more closely tailored to her expressed belief that, in light of the victim's repeated threats to harm her and the fact that he would not permit her to leave, she was compelled to use deadly physical force at the time that she did because doing so was necessary to defend herself effectively. Under such a theory of defense, the defendant might have been able to demonstrate that, despite the fact that at the moment of the shooting the victim was neither using nor immediately about to use force against her, it was reasonable for her to have used deadly physical force when she did. See, e.g., 2 P. Robinson, Criminal Law Defenses (1984) § 131 (c), pp. 77–79 (discussing defensive force defenses that are based on immediate necessity to defend rather than those that are based on use or imminent use of force).

[27] The defendant has not provided this court with an independent analysis of her claim under the state constitution. Thus, we deem that aspect of her claim to be abandoned. See *State* v. *Hearl*, 182 Conn. App. 237, 271 n.28, 190 A.3d 42, cert. denied, 330 Conn. 903, 192 A.3d 425 (2018).

[28] Pursuant to *Golding*, a defendant may prevail on a claim of constitutional error not preserved at trial only if all four of the following conditions are satisfied: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding* by eliminating word "clearly" before words "exists" and "deprived").

[29] The defendant urges us to conclude that defense counsel did not waive the present claim of error because he was compelled to respond quickly to the jury's unexpected request and "did not have time to reflect on the ramifications of the judge's response to this unusual request." As our case law reflects, however, waiver is not dependent on a showing that a party was aware of the "legal efficacy" of the claim, but merely that he is aware of its existence and its "reasonably possible efficacy." (Internal quotation marks omitted.) *State* v. *Velez*, supra, 113 Conn. 357–58. It belies the sweeping nature of the claim raised on appeal to suggest that it is unreasonable to apply the waiver doctrine in the context of this claim. "We recognize that, during the heat of trial, it is typical for counsel to set forth objections and responses thereto that may not be as complete or well researched as the arguments set forth in an appellate brief . . . ." *State* v. *Papineau*, 182 Conn. App. 756, 770, 190 A.3d 913, cert. denied, 330 Conn. 916, 193 A.3d 1212 (2018). Nonetheless, "[t]he defendant's counsel, acting on the defendant's behalf, had an immediate duty to object to the court's proposed instruction if he deemed it improper." *State* v. *Diaz*, 109 Conn. App. 519, 537, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008). The court, hearing no objection from defense counsel or a request for additional time to consider the issue, was under no obligation to evaluate counsel's understanding of the relevant law before relying on counsel's agreement on how to proceed. See, e.g., *State* v. *Holness*, 289 Conn. 535, 544, 958 A.2d 754 (2008) (defense counsel may waive potential constitutional claims in exercise of his or her professional judgment, and court need not canvass counsel with respect to his or her understanding of relevant constitutional principles before accepting counsel's agreement on how to proceed).

[30] In *State* v. *McClain*, supra, 324 Conn. 815 n.10, our Supreme Court expressly overruled this court's decision in *State* v. *Rosado*, supra, 147 Conn.

App. 702, to the extent that it stated that an implied waiver of a claim of instructional error pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2016), precluded relief under the plain error doctrine. The defendant in the present case does not raise a claim of plain error.

———————————————